UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HARRIS COUNTY, TEXAS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-19-4994 |
| | § | |
| ELI LILLY AND COMPANY *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are two motions to dismiss.[1]  Dkts. 40, 41.  Defendants Eli Lilly and Company, Novo Nordisk Inc., and Sanofi-Aventis U.S. LLC (collectively, the "Manufacturer Defendants") moved separately from the pharmacy benefit manager defendants (collectively, the "PBM Defendants").  *Id.*  Plaintiff Harris County responded jointly to both motions.  Dkt. 48.  The defendants replied.  Dkts. 61, 62.  Having considered the motions, responses, replies, and applicable law, the court is of the opinion that both motions (Dkts. 40, 41) should be GRANTED in PART and DENIED in PART.

**I. BACKGROUND**

Plaintiff Harris County ("Harris County") is a "body corporate and politic under the laws of the State of Texas."[2]  Dkt. 20 at 7.  The government of Harris County serves nearly five million residents.  *Id.*  Harris County also provides health benefits to approximately 38,000 employees, retirees, and their dependents ("Beneficiaries").  *Id.*  One of the benefits Harris County offers

---

[1] Both the Manufacturer Defendants and the PBM Defendants requested oral argument. However, the court finds that an oral hearing is unnecessary.  Accordingly, these requests are DENIED.

[2] Under Federal Rule of Civil Procedure 12(b)(6), the court accepts Harris County's allegations as true.  *See Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001).

Beneficiaries is subsidizing their purchases of necessary pharmaceutical drugs, including diabetes medications like insulin. *Id.* Harris County also pays for diabetes medications for inmates in its county jails. *Id.*

The Manufacturer Defendants manufacture, promote, and distribute pharmaceutical drugs, including diabetes medications and the insulins at issue in this case. *Id.* at 8–11. Together, the Manufacturer Defendants "make 99% of the insulins in the market today." *Id.* at 27. Specifically, Eli Lilly manufactures, promotes, and sells Humulin N, Humulin R, Humalog, Trulicity, and Basaglar. *Id.* at 8. Sanofi-Aventis U.S. LLC manufactures, promotes, and sells Lantus, Toujeo, Soliqua, and Apidra. *Id.* at 9. Novo Nordisk Inc. manufactures, promotes, and sells Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic. *Id.* at 10.

The PBM Defendants are named in their capacities as both pharmacy benefit managers and mail-order pharmacies which "dispense[] diabetes medications, including diabetes medications at issue in this [case] . . . through [their mail-order] pharmacies." *Id.* at 15, 18, 20–21. The PBM Defendants "own [mail-order] and specialty pharmacies, which purchase and take possession of prescription drugs, including those at issue here, and directly supply those drugs to patients by mail." *Id.* at 42. The PBM Defendants administer health plans' prescription drug programs by "develop[ing] the health plan's drug formulary, process[ing] claims, creat[ing] a network of retail pharmacies, [and] set[ting] the prices that the health plan will pay for prescription drugs . . . ." *Id.* at 41–42. The PBM Defendants also contract with manufacturers to "negotiate rebates, fees and other concessions with the manufacturers that are paid back to the PBM[s]." *Id.* It is these rebates that are at the center of this case.

According to Harris County, the prices of specific insulins have drastically increased over the past fifteen years, and that increase cannot be accounted for primarily because of inflation or

other market forces. *Id.* at 27–39. The production costs for insulin have decreased, and "the insulins at issue in this case have either been available in the same form" for twenty to thirty years or are "biologically equivalent" to insulins which were available twenty to thirty years ago. *Id.* at 28. For example, from 2007 to 2018, Novo Nordisk raised the price of Novolog by over $500. *Id.* at 34. Since 2008, Eli Lilly has increased the price for a package of Humalog pens by over $400. *Id.* at 32. As a result of the alleged price increases, "as many as one in four people with diabetes are now skimping on or skipping lifesaving doses" of insulin, and health plans are spending "tens of billions of dollars" on diabetes medications. *Id.* at 31, 36. From 2013 to 2018, Harris County claims that it spent over $27,000,000 on the at-issue diabetes medications. Dkt. 20-1.

Harris County contends that these price increases are the result of purposeful anticompetitive behavior; it alleges that it has been fraudulently overcharged and has overpaid for the at-issue medications because the PBM Defendants and the Manufacturer Defendants conspired to artificially raise the prices of diabetes medications in what Harris County calls the "Insulin Pricing Scheme." Dkt. 20 at 48. In the alleged Insulin Pricing Scheme, "[the] Manufacturer Defendants have agreed with each other and [the] PBM Defendants to raise their publicly reported prices . . . but largely maintain the net price [of each drug] by paying a significant portion of th[e] price back to [the] PBM Defendants" in the form of rebates and fees. *Id.* at 50. The "Manufacturer Defendants have exponentially raised the reported prices of insulin products in near perfect unison," but their net price has not increased because the extra money allegedly goes to the PBM Defendants as rebates. *Id.* at 39. In exchange for the rebates, the PBM Defendants provide preferred placement at the highest inflated price of the Manufacturer Defendants' drugs on drug formulary lists. *Id.* at 5. The Manufacturer Defendants could potentially lose billions of dollars if their drugs are not included on formulary lists because the PBM Defendants have a dominant

market share and essentially act as gatekeepers in determining "which drugs insurance or health plans will pay for and at what rate." *Id.* at 49.  In short, Harris County alleges that the Manufacturer Defendants have agreed with the PBM Defendants to purposefully inflate the reported prices of diabetes medications while refunding a large portion of the price of each unit sold back to the PBMs in the form of rebates and administrative fees in a *quid pro quo* to purchase preferred formulary position.  *Id.* at 51.  Additionally, according to Harris County, the gap between the reported price and the net price of the at-issue medications creates a "massive slush fund" which the PBM Defendants then use to "extract hidden profits" from others, including health plans like Harris County's.  *Id.* at 50.

The PBM Defendants allegedly benefit from the Insulin Pricing Scheme in several different ways.  *Id.* at 56.  They allegedly keep "significant portions of the payments made by [the] Manufacturer Defendants" to the PBM Defendants to buy preferred placement on formulary lists in what Harris County calls the "Secret Payment Game."  *Id.*  The PBM Defendants also allegedly charge health plans like Harris County's for diabetes medications based on the inflated reported prices.  *Id.*  The PBM Defendants then separately negotiate with pharmacies to reimburse them at a lower price than the inflated reported prices which Harris County allegedly pays for the same medication.  *Id.*  Then the PBM Defendants allegedly pocket the difference between the inflated prices Harris County pays for diabetes medications and the lower prices at which the PBM Defendants reimburse pharmacies for the same medications, which Harris County has labeled the "Pharmacy Spread."  *Id.*  Additionally, the PBM Defendants allegedly use the inflated prices of diabetes medications to increase their own profits on diabetes medications they sell through their own mail-order pharmacies.  *Id.*

4

Harris County negotiated contract provisions in contracts with the PBM Defendants which required the PBM Defendants to pay them a portion of the rebates on the at-issue medications, but then the PBM Defendants allegedly relabeled the rebates with vague terms like "administrative fees, volume discounts, service fees, [and] price or margin guarantees" so that they could keep more of the rebate money for themselves. *Id.* at 57. For example, Express Scripts allegedly keeps up to thirteen times more in "administrative fees" than it pays to health plans as part of the rebate system. *Id.* at 58.

According to Harris County, the PBM Defendants' alleged behavior is particularly troubling because they allegedly misrepresented to Harris County that they would use their market power and expertise to negotiate with the Manufacturer Defendants to save Harris County money on diabetes medications. *Id.* at 61. They also claimed that they were giving rebates to health plans like Harris County's in a transparent payment structure when they were instead allegedly keeping most of those rebates. *Id.* at 65. For example, in an interview with CBS News in 2017, the CEO of Express Scripts said that their rebate and payment structures are transparent and that their clients know precisely how rebates from the Manufacturer Defendants are distributed, which Harris County claims is untrue. *Id.* at 65. The PBM Defendants also claimed that they chose drugs for formulary placement based primarily on their health and safety—not on the amounts of rebates they received from the Manufacturer Defendants. *Id.* at 61. Harris County alleges that the PBM Defendants made these misrepresentations specifically so that Harris County would rely on the misrepresentations and pay the inflated reported prices for the at-issue medications. *Id.*

5

Harris County filed suit alleging multiple theories of liability.[3]  Both the Manufacturer Defendants and the PBM Defendants urge the court to dismiss Counts One, Two, Three, and Four of Harris County's complaint, which allege violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO").  Dkts. 40, 41.  Both groups of defendants also ask the court to dismiss Harris County's state law claims in Counts Seven, Eight, Nine, Ten, and Eleven.[4]  Dkts. 40, 41.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007).  At the pleading stage, the court must "accept all well-pleaded facts in the complaint as true and view the facts in the light most favorable to the plaintiff."  *O'Daniel v. Indus. Serv. Sols.*, 922 F.3d 299, 304 (5th Cir. 2019).  "Motions to dismiss are viewed with

---

[3] The court does not address Counts Five and Six because Harris County asked the court to dismiss those causes of action without prejudice. Dkt. 48 at 4 n.3. Defendants do not oppose dismissal of those claims. *Id.* Accordingly, Harris County's request to dismiss Counts Five and Six without prejudice is GRANTED.

[4] In a footnote, the PBM Defendants ask the court to dismiss the parent companies of the PBM Defendants, alleging that the parent companies were only named "in their capacity as corporate parents." Dkt. 41 at 12. Arguments raised only in a footnote may be waived. *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."); *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) ("[B]y failing to raise this issue other than by a passing reference in a footnote, [the plaintiff] has waived it."); *Branch v. CEMEX, Inc.*, No. CIV.A. H-11-1953, 2012 WL 2357280, at *12 n.8 (S.D. Tex. June 20, 2012) (noting that arguments that are not properly addressed in the body of a brief are likely waived). Still, the court addresses the argument on its merits, albeit in a footnote. Harris County contends that the entities which the PBM Defendants ask the court to dismiss "were directly involved in the PBM activities that gave rise to Harris County's causes of action." Dkt. 48 at 28; Dkt. 20 at 13–20. Thus, the motion to dismiss these defendants on this ground is DENIED.

disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005). In considering a motion to dismiss, usually the court "may rely on only the complaint and its proper attachments." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

### B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to state with particularity the circumstances constituting fraud. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). The Fifth Circuit interprets Rule 9(b) strictly; to plead a fraud claim with the requisite particularity requires that the "who, what, when, and where must be laid out *before* access to the discovery process is granted." *Id.* at 178. However, Rule 9(b) must be applied "as part of the entire set of rules, including Rule 8(a)'s insistence upon 'simple, concise, and direct' allegations." *Id.* Courts should also consider "the beacon of Rule 8(f) that 'all pleadings shall be construed as to do substantial justice.'" *Id.* Plaintiffs must be given a "fair opportunity to plead." *Id.*

### III. ANALYSIS

### A. RICO Claims

Section 1964(c) of 18 U.S.C. provides a private civil action and treble damages for those who are injured by violations of RICO's substantive provisions. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 481, 105 S. Ct. 3275 (1985). Harris County alleges that the Manufacturer Defendants and the PBM Defendants conspired to violate § 1962(c), which would also be a violation of § 1962(d)'s prohibition on conspiring to violate RICO. Dkt. 20 at 76–126. Both groups of defendants argue that Harris County does not have standing to bring a RICO claim because it is barred by the "indirect-purchaser" rule articulated in *Illinois Brick* and that the co-

conspirator exception to the "indirect-purchaser" rule is inapplicable here.[5]  Dkts. 40, 41 (citing

*Ill. Brick Co. v. Illinois*, 431 U.S. 720, 97 S. Ct. 2061 (1977)).  The defendants also argue that

Harris County has failed to allege its RICO claims with the particularity required for allegations

of fraud by Federal Rule of Civil Procedure 9(b), including allegations of fraud under RICO.  Dkts.

40, 41.  Additionally, the defendants allege that Harris County has not sufficiently alleged that the

defendants operated or managed any RICO enterprises or that defendants conspired to violate

RICO.  Dkts. 40, 41.  Lastly, the defendants argue that Harris County has not alleged that its

injuries were proximately caused by a RICO violation or conspiracy, which is required to establish

standing under RICO.  Dkts. 40, 41; *see Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th

Cir. 1998).

To state a RICO claim under § 1962(c) requires a plaintiff to allege "(1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity."  *Sedima*, 473 U.S. at 496.  Section

1962(d) prohibits conspiring to violate RICO.  18 U.S.C. § 1962(d).  "RICO is to be read broadly"

so as to deter potential violators.  *Sedima*, 473 U.S. at 497.  A RICO plaintiff must also establish

standing by alleging injury and causation.  *See Price.*, 138 F.3d at 606; *In re Taxable Mun. Bond*

*Sec. Litig.*, 51 F.3d 518, 521 (5th Cir. 1995) ("The standing provision of civil RICO provides that

---

[5] Citing cases that are legally and factually distinguishable from this one, the Manufacturer
Defendants also argue that Harris County cannot proceed with its RICO claims because it
benefitted from and participated in the alleged scheme.  Dkt. 40 at 29–30 (citing *Republic of Iraq
v. ABB AG*, 768 F.3d 145, 167–68 (2d Circuit 2014); *Cenco Inc. v. Seidman & Seidman*, 686 F.2d
449, 454 (7th Cir. 1982)).  The court declines to address this argument because whether Harris
County benefitted from or participated in the alleged scheme is a disputed question of fact which
is inappropriate at this stage in the litigation.  *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir.
1999) (per curiam) ("The issue [during the motion to dismiss stage] is not whether the plaintiff
will ultimately prevail, but whether he is entitled to offer evidence to support his claim.").

'[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue.'" (quoting 18 U.S.C. § 1964(c))).

### 1. RICO Predicate Acts

"The term 'racketeering activity' is defined to include a host of so-called predicate acts," including mail and wire fraud. *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131 (2008) (quoting U.S.C. 18 § 1961). "[W]ire fraud involves the use of, or causing the use of, wire communications in furtherance of a scheme to defraud." *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 675 (5th Cir. 2015). "The mail fraud statute applies to anyone who knowingly causes to be delivered by mail anything for the purpose of executing any scheme or artifice to defraud." *Id.* (quoting *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009)). Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead fraud claims with particularity and applies to plaintiffs pleading predicate acts for RICO claims "resting on allegations of fraud." *Williams*, 112 F.3d at 177. Both the Manufacturer Defendants and the PBM Defendants contend that Harris County has not pled its fraud allegations with the requisite level of particularity, but the court disagrees.[6] Harris County outlines its mail and wire fraud allegations with the required level of detail at this stage in the litigation because they provide the "who, what, when, and where" of the alleged fraud.

---

[6] Both the Manufacturer Defendants and the PBM Defendants cite to *Poe v. Bock* for the proposition that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." Dkt. 40 at 29 (citing *Poe v. Bock*, No. EP-17-CV-00232-DCG, 2018 WL 4275839, at *4 (W.D. Tex. Sept 7, 2018) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)); Dkt. 41 at 10 (same). *Poe* is both legally and factually distinguishable from Harris County's case. 2018 WL 4275839, at *4. First, the court in *Poe* was analyzing the continuity element when discussing the importance of scrutiny in RICO claims based on mail or wire fraud, not Rule 9(b) particularity. *Id.* Second, the plaintiffs in that case alleged a "narrow scheme" to "wrest away control" of a family business with facts vastly different from those Harris County alleges. *Id.* Thus, the court is not persuaded by *Poe*.

*Id.* at 178.  Harris County alleges that the Manufacturer Defendants and the PBM Defendants engaged in mail and wire fraud by publishing intentionally inflated reported prices and "basing the price Harris County paid for diabetes medications" on those excessive prices while fraudulently representing to Harris County that those prices (1) were reasonably related to the "net price realized by [the] [d]efendants" and (2) "result[ed] from competitive market forces."   Dkt. 20 at 68. According to Harris County, the Manufacturer Defendants have agreed with the PBM Defendants to send payments to the PBM Defendants for each unit sold in exchange for preferred placement on the PBM Defendants' formulary lists, which increases utilization of the at-issue drugs.  *Id.* at 47.  Harris County alleges that the PBM Defendants misrepresented to Harris County that they negotiate with the Manufacturer Defendants "for the benefit of health plans . . . and to save health plans money" and that they "design[] pharmaceutical plans and construct[] formularies for the purposes of promoting client health and safety" when they are actually working with the Manufacturer Defendants in the Insulin Pricing Scheme.  *Id.* at 61.  Harris County alleges that the PBM Defendants made numerous fraudulent representations that contributed to the alleged Insulin Pricing Scheme at various specific times in annual reports, public statements, and marketing materials.[7]  *Id.* at 61–70.  For example, in an annual report, Express Scripts stated that it makes formulary recommendations by "consider[ing] the drug's safety and efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement we might negotiate with the manufacturer."  *Id.* at 62 (quoting Express Scripts,

---

[7] The PBM Defendants argue that Harris County cannot "lump together" all of the PBM Defendants while still satisfying Rule 9(b).  Dkt. 41 at 11 (quoting *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738).  The court agrees that there must be facts pled about each defendant. *See* 938 F.3d at 738.  However, even though Harris County does often refer to the PBM Defendants collectively, it also alleges facts about each defendant.  Dkt. 20 at 51–53, 60–67.  Thus, the motion to dismiss on this ground is DENIED.

Annual Report (Form 10-K) (Dec. 31, 2017)).  Similarly, OptumRx claimed in an annual report that its formularies are selected based on "their safety, cost, and effectiveness." *Id.* at 63 (quoting OptumRx, Annual Report (Form 10-K) (Dec. 31, 2017)).  Additionally, Harris County alleges that it received various fraudulent written solicitation materials from several of the PBM Defendants. *Id.* at 67.  For example, on June 19, 2012, Harris County allegedly received solicitation material in the mail directly from Aetna Rx, working with CVS Caremark, which stated that Aetna Rx's pharmacy benefit services would help Harris County lower the cost of prescriptions for diabetes beneficiaries specifically.  *Id.*  The court finds that all of these allegations combined are enough to satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b).  Therefore, the court holds that the motions to dismiss on this ground are DENIED.

The Manufacturer Defendants argue that they have never stated publicly that their prices are reasonably related to their net prices or that their prices are the result of competitive market forces, and thus, they cannot have committed mail and wire fraud.  Dkt. 40 at 30.  They argue that their public acknowledgement of the difference between their reported prices and net prices as a result of the rebate system insulates them from any allegations of fraud.  *Id.* at 31.  Again, the court disagrees.  The fact that the Manufacturer Defendants might have publicly acknowledged the difference between their reported price and net price at some point does not preclude the possibility that the Manufacturer Defendants worked with the PBM Defendants in a coordinated effort to artificially raise that reported price and then publish it as part of the fraudulent scheme Harris County alleges in a *quid pro quo* for preferred placement on formulary lists.  Dkt. 20 at 47.  Harris County has adequately pled its mail and wire fraud allegations because the act of publishing allegedly artificially inflated prices in and of itself as part of an allegedly fraudulent scheme is enough; federal courts have held that the act of publishing artificially inflated prices can constitute

mail and wire fraud.  *See, e.g.*, *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 3:18-CV-2211-BRM-LHG, 2019 WL 1418129, at *11 (D.N.J. Mar. 29, 2019) (holding that plaintiffs had adequately pled mail and wire fraud when they alleged that the pharmaceutical manufacturer defendants had published artificially inflated prices through mail and interstate wire facilities); *In re Insulin Pricing Litig.*, No. 3:17-CV-0699-BRM-LHG, 2019 WL 643709, at *5 (D.N.J. Feb. 15, 2019) (same).

The Manufacturer Defendants also argue that federal law requires them to report list price minus "prompt pay or other discounts, rebates or reductions in price."  Dkt. 40 at 31 (quoting 42 U.S.C. § 1395w-3a(c)(6)(B)).  Harris County notes that the cited statute concerns only "how the United States chooses to pay for Medicaid reimbursed drugs" and that the cited statute "is irrelevant to the deceptiveness of Defendants' non-Medicaid pricing representations at issue in this case."  Dkt. 48 at 32.  The Manufacturer Defendants cite to no authorities for their proposition, and at least one federal court has rejected a similar argument.  Dkt. 40 at 31; *see Minn. by Ellison v. Sanofi-Aventis U.S. LLC*, No. 318CV14999BRMLHG, 2020 WL 2394155, at *14 (D.N.J. Mar. 31, 2020) (holding that the state statute governing payment for drugs for Medicaid patients had no bearing on plaintiffs' fraud claims regarding non-Medicaid pricing).  Accordingly, the motion to dismiss on this ground is DENIED.

Lastly, the Manufacturer Defendants argue that Harris County's complaint is ultimately only about the fact that Harris County thinks insulin is too expensive and that "allegedly excessive pricing does not constitute fraud."  Dkt. 40 at 31.  The Manufacturer Defendants cite to a case from another circuit that is both factually and legally distinguishable and has very little in common with this case except that the defendants manufactured prescription medications.  *Id.* (quoting *Eike v. Allergan, Inc.*, 850 F.3d 315, 318 (7th Cir. 2017)).  In that case, the plaintiffs were consumers who

took eye drops for glaucoma who sued the defendants under the theory that the eye drops were "unnecessarily large" and that the "optimal size of an eye drop" was smaller. *Id.* at 316. There were no allegations of collusion or misrepresentation. *Id.* The court, of course, held that the plaintiffs' case should be dismissed with prejudice because "[y]ou cannot sue a company and argue only . . . [that] 'it could do better by us' . . . which is all they . . . argu[ed]." *Id.* at 318. In contrast, Harris County has made numerous allegations of misrepresentation and fraud. Dkt. 20. Accordingly, the court is not persuaded by this argument.[8]

The court is also not persuaded by the PBM Defendants' argument that their allegedly fraudulent statements were "generalized statements of superiority" that courts typically reject.[9] Dkt. 41 at 14 (quoting *Cnty. of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1039 (N.D. Cal. 2011). In *Deloitte*, the defendant published general statements about its abilities. 836 F. Supp. 2d at 1039. For example, the defendant claimed to be "uniquely qualified" and claimed

---

[8] The Manufacturer Defendants cite to several additional nonbinding cases that are distinguishable factually and legally from this case for the proposition that "[e]ven charging different prices to differently situated individuals for prescription medications is not unlawful." Dkt. 40 at 31 (citing *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1313–14 (11th Cir. 2000) (holding that a pharmacy defendant had no duty to disclose differential pricing structures to uninsured consumer plaintiffs who were routinely charged more than insured consumers); *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 70 (1st Cir. 1998) (holding that defendants had no duty to disclose "everything negative that the buyer might be interested in learning about the transaction or item to be purchased.")). While differential pricing in and of itself is not unlawful, Harris County has alleged more than differential pricing. Dkt. 20 at 47–74. Thus, the motion to dismiss on this ground is DENIED.

[9] The PBM Defendants also argue that Harris County must allege facts showing that the statements of the PBM Defendants which Harris County compiled are false as to the PBM Defendants' *overall* businesses, not just insulin. Dkt. 41 at 15. They claim this is necessary "[b]ecause the compiled statements concern each PBMs' overall business (and are not specific to insulin)." *Id.* To support this argument, the PBM Defendants cite to two cases which are factually and legally distinguishable and do not even concern RICO claims. *Id.* (citing *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No. CV1706656ABFFMX, 2019 WL 3000646, at *4 (C.D. Cal. May 22, 2019); *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 900 (5th Cir. 2018)). Accordingly, the court rejects this argument.

to have "deep experience" and a "seasoned team." *Id.* at 1038.  In contrast to *Deloitte* and the other cases to which the PBM Defendants cite, the statements upon which Harris County bases its claims are not the type of general, vague statements which the *Deloitte* court rejected as proof of fraud.  Dkt. 41 at 14–15 (citing *Infowise Sols., Inc. v. Microstrategy, Inc.*, No. CIV.A. 3:04-CV-0553-, 2005 WL 2445436, at *3 (N.D. Tex. Sept. 29, 2005) (referring to "strong work" and "fair revenue" as "puffery"); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir. 1997), *aff'd*, 525 U.S. 299, 119 S. Ct. 710 (1999), *and overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (rejecting as proof of fraud commercials which stated only that the defendant could "control costs" and help the employers and employees to "save money"); *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1018 (E.D. Wis. 2010) ("[P]uffery does not constitute fraud").  Further, the allegedly fraudulent solicitations which Harris County describes in its complaint are only part of Harris County's fraud claim.  Dkt. 20 at 76–124.  Harris County also alleges that the PBM Defendants and the Manufacturer Defendants conspired to artificially inflate prices of diabetes medications.  *Id.* at 79.  They then allegedly published those artificially inflated prices in a *quid pro quo* scheme of money in the form of "rebates, administrative fees and other soft dollars" in exchange for preferred placement on formulary lists.[10]  Dkt. 20 at 79, 95, 111.  As

---

[10] The PBM Defendants contend that the Manufacturer Defendants' publication of allegedly inflated prices does not "concern" the PBMs.  Dkt. 41 at 11.  Harris County alleges that the PBM Defendants "agreed with" the Manufacturer Defendants to artificially raise prices as part of the Insulin Pricing Scheme and then publish those prices.  Dkt. 20 at 47.  To the extent that the PBM Defendants intend to argue that they are not responsible for the publication of allegedly inflated prices even if they conspired with the Manufacturer Defendants to raise those prices because they did not directly publish the prices, the court rejects that argument.  Participants in a RICO enterprise are jointly and severally liable for the acts of any member of the enterprise.  *See, e.g.*, *United States v. Edwards*, 303 F.3d 606, 643 (5th Cir. 2002).  To the extent that the PBM Defendants intend to argue that they are not responsible for any allegedly inflated prices because they did not conspire with the Manufacturer Defendants to raise those prices, that is a question of

14

previously mentioned, federal courts have held that the act of publishing artificially inflated prices to advance an allegedly fraudulent scheme is enough by itself to constitute the required predicate act of mail and wire fraud for RICO liability.  *See MSP Recovery Claims*, 2019 WL 1418129, at *11; *In re Insulin Pricing*, 2019 WL 643709, at *5.  Accordingly, the court holds that Harris County has adequately pled RICO predicate acts, and the motions to dismiss on this ground are DENIED.

### 2. RICO Enterprise

Harris County alleges twelve separate enterprises in this case, each consisting of one of the Manufacturer Defendants and one of the PBM Defendants.  Dkt. 20 at 77–123.  Both the Manufacturer Defendants and the PBM Defendants argue that Harris County has not sufficiently alleged that the defendants operated or managed any RICO enterprises.  Dkts. 40, 41.  They also argue that Harris County has failed to show that the enterprise exists outside of the allegedly illegal behavior.  Dkt. 41 at 21.  A defendant faces liability under RICO only if the defendant "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S. Ct. 1163 (1993).  An association-in-fact enterprise requires "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit [the] associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946, 129 S. Ct. 2237 (2009).  The U.S. Supreme Court has specifically held that the concept of an association-in-fact enterprise is "expansive" and that the definition of enterprise in the RICO statute is meant to have a "wide reach." *Id.* at 944.

---

fact which is inappropriate at this stage in the litigation, so the court declines to address this argument. The motion to dismiss for this reason is DENIED.

According to Harris County, each of the separate enterprises acted with the common fraudulent purpose of inflating reported prices for diabetes medications in order to profit from the Insulin Pricing Scheme.  Dkt. 20 at 80.  They also allegedly share the common purpose of "perpetuating the use of the reported prices of diabetes medications as the basis for the price that health plans' [sic] pay for diabetes medications."  *Id.*  Harris County details the relationships between the Manufacturer Defendants and the PBM Defendants, alleging that the enterprises operated over the span of many years and are still ongoing today.  *Id.* at 77–123.  The complaint also provides a motive; it alleges that each enterprise "derived secret profits that are greater than either . . . [the Manufacturer Defendants] or any one of the PBM Defendants could obtain absent their misrepresentations regarding their non-transparent pricing schemes."  *Id.* at 79.  These allegations also satisfy the "participation" requirement for RICO because the facts as alleged required both groups of defendants to participate; Harris County alleges that the Manufacturer Defendants and the PBM Defendants worked together to publish artificially inflated prices for diabetes medications as part of a larger fraudulent scheme, which constitutes participation.[11] *Reves*, 507 U.S. at 185.  In reviewing the complaint in the light most favorable to Harris County with an "expansive" view of a RICO enterprise as the court is required to do under *Boyle*, the court is persuaded that Harris County has adequately pled the enterprise element.  *Boyle*, 556 U.S. at 944.

---

[11] In the reply to their motion to dismiss, the Manufacturer Defendants raise an additional argument about their alleged involvement in the alleged enterprises' affairs, claiming that they "cannot have directed the affairs of the alleged enterprises because they play no role in determining how the PBM Defendants share rebates and other payments with their health plan clients." Dkt. 62 at 4. The court declines to address this argument and deems it waived because it was raised for the first time in the Manufacturer Defendants' reply. *See Murthy v. Abbott Labs.*, 847 F. Supp. 2d 958, 977 n.9 (S.D. Tex. 2012) (Ellison, J.) (declining to analyze argument that movant waived by raising it for the first time in reply to its motion to dismiss).

Both groups of defendants rely heavily on the Seventh Circuit's reasoning in *United Food* to argue that Harris County has not adequately pled any enterprises.[12]   *United Food & Com. Workers Unions & Emp. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013).   The court is not bound by *United Food*, and it is nevertheless distinguishable.   In *United Food*, the plaintiff insurance provider brought suit against Par, a drug manufacturer defendant, and Walgreens, a pharmacy defendant.   *Id.* at 850.   Par "realiz[ed] . . . the disparity between reimbursement formulas for . . . different dosage forms of . . . [prescription medications] presented an opportunity for profit . . . [and] crafted a marketing pitch aimed at convincing pharmacies to purchase the more expensive dosage forms of each one."   *Id.* at 852.   The presentations made it seem as if "pharmacies could legally fill prescriptions written for one dosage form with an alternative dosage form without seeking approval from the prescribing physician, a suggestion that directly contravened the FDA's position . . . ."   *Id.*   As Par suggested, Walgreens then started switching dosage forms and did so for several years before the "dosage-form-

---

[12] In another footnote, the PBM Defendants also argue that corporations cannot join an association-in-fact enterprise.   Dkt. 41 at 22.   As discussed above, arguments raised only in a footnote may be waived.   *See United States v. Hardman*, 297 F.3d at 1131 ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."); *United States v. White*, 879 F.2d at 1513 ("[B]y failing to raise this issue other than by a passing reference in a footnote, [the plaintiff] has waived it."); *Branch v. CEMEX, Inc.*, 2012 WL 2357280, at *12 n.8 (noting that arguments that are not properly addressed in the body of a brief are likely waived).   Still, the court addresses this argument on its merits.   The PBM Defendants cite to a case in the Eleventh Circuit to support their proposition that corporations cannot join an association-in-fact enterprise.   Dkt. 41 at 22 (citing *United States v. Hartley*, 678 F.2d 961, 989 n.46 (11th Cir. 1982), *abrogated by United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1271 (11th Cir. 2000)).   A subsequent Eleventh Circuit case rejected this idea, stating that "a group of corporations can be a 'group of individuals associated in fact' within the meaning of the 'enterprise' definition of 18 U.S.C. § 1961(4)."   *United States v. Navarro-Ordas*, 770 F.2d 959, 969 n.19 (1985).   The PBM Defendants cite to two other district court cases that are factually and legally distinguishable.   Dkt. 41 at 22 (citing *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1364 (M.D. Fla. 2005); *Benard v. Hoff*, 727 F. Supp. 211, 215 (D. Md. 1989)).   Thus, the court rejects this argument.   The motions to dismiss on this ground are DENIED.

switching practices . . . attracted scrutiny from a number of states' attorneys general and the Department of Justice." *Id.* In deciding that the plaintiff had not sufficiently pled the existence of an enterprise, the court reasoned that "RICO does not penalize parallel, uncoordinated fraud." *Id.* at 855. The court noted that "officials from either company [were not] involved . . . in the affairs of the other" and that it was "far from obvious that Walgreens could not have accomplished the drug-switching scheme on its own by simply purchasing expensive dosage forms from Par and other manufacturers (of which there were apparently several) and filling prescriptions with these expensive dosage forms on its own initiative." *Id.* at 856.

Unlike in *United Food*, Harris County alleges that the Manufacturer Defendants and the PBM Defendants worked together to pursue the interests of the enterprise by engaging in a *quid pro quo* exchange of money in the form of "rebates, administrative fees and other soft dollars" for preferred placement on formulary lists; the Manufacturer Defendants and the PBM Defendants could not have engaged in the alleged fraud if they were not working together because the alleged fraud required a coordinated effort. Dkt. 20 at 79, 95, 111. Unlike in *United* where the plaintiffs asked the court to infer coordinated activity simply because the activities of both defendants were allegedly illegal and both defendants benefitted, Harris County pleads facts alleging a coordinated effort on behalf of all defendants to violate RICO. *Id.* at 76–123. The Manufacturer Defendants have even publicly acknowledged that they have to allow money for rebates so that PBMs will be motivated to place their drugs on formulary lists. *Id.* at 52. In *United Food*, the court found that the plaintiff's allegations were "entirely consistent with [the defendants] each going about [their] own business." 719 F.3d at 855. In contrast, Harris County has alleged that both groups of defendants are doing something more than simply conducting business as usual—they are allegedly conspiring to artificially raise prices to profit from the Insulin Pricing Scheme. Dkt. 20

18

at 76–123.  Like the court in *In re Insulin Pricing*, the court finds that "[p]laintiffs have alleged conduct that would not occur in competition for business in a legitimate market."  *In re Insulin Pricing*, 2019 WL 643709, at \*6.

The court also rejects the PBM Defendants' argument that Harris County has not adequately pled "an enterprise that has an existence that can be defined apart from the commission of the predicate acts."  Dkt. 41 at 21–22 (quoting *Zastrow v. Hous. Auto Imports Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015)).  In *Zastrow*, the Fifth Circuit held that the plaintiff had not adequately pled an enterprise because the plaintiff "allege[d] an enterprise created by the alleged racketeering activity itself."  789 F.3d at 562.  In other words, there was no association between the two defendants except for the allegedly illegal behavior related to the RICO scheme, and the plaintiff had not shown that the organization was ongoing or functioning as a "continuing unit." *Id.* (quoting *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 426 (5th Cir. 1987)).  In contrast to the plaintiff in *Zastrow*, Harris County alleges that the PBM Defendants and the Manufacturer Defendants have an association beyond the alleged predicate acts in that there are "contractual relationships, financial ties and continuing coordination of activities" between the parties.  Dkt. 20 at 78.  For example, the PBM Defendants contract with the Manufacturer Defendants "to negotiate rebates, fees and other concessions with the manufacturers that are paid back to the PBM."  *Id.* at 42.  Both groups of defendants have longstanding relationships with each other and interact with each other regularly.  *Id.* at 45.  For example, the Pharmaceutical Care Management Association holds several conferences every year, and all of the PBM Defendants are members of this organization.  *Id.* at 45.  During the past six years, the Manufacturer Defendants were "Presidential Sponsors" of these conferences.  *Id.* at 46.  As sponsors, the

Manufacturer Defendants hosted meeting rooms that offered opportunities for private interactions between the PBM Defendants and the Manufacturer Defendants.  *Id.*

Although the evidence alleged by Harris County to support a pattern of racketeering overlaps with the evidence of the association-in-fact enterprise, the ongoing business relationships between the defendants indicate an association beyond the predicate acts of which the defendants are accused.  *See Boyle*, 556 U.S. at 947 ("[T]he evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524 (1981)); *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978) ("[A] RICO enterprise cannot be expected to maintain a high profile in the community. Its affairs are likely to be conducted in secrecy . . . .").  Thus, the motions to dismiss on this ground are DENIED.

### 3. RICO Pattern of Racketeering Activity

To establish a pattern of racketeering activity, "a plaintiff must show both a relationship between the predicate offenses—here mail fraud and wire fraud—and the threat of continuing activity."  *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893 (1989)).  "[T]o prove a pattern of racketeering activity, a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J., Inc.*, 492 U.S. at 239.  Harris County alleges a scheme which involves thousands of related mail and wire transmissions for the common purpose of deceiving Harris County and other health plans that allegedly occurred over a period of many years and is still ongoing today; thus, there is a threat of continuing activity, and the alleged predicate acts are related as part of one alleged scheme.  Dkt. 20 at 50, 61–74, 76–124. This is enough to constitute a pattern of racketeering activity.  *Id.*

The PBM Defendants argue that Harris County has failed to allege "facts demonstrating a pattern of criminality extending beyond the predicate acts themselves" and that "[a]lleging predicate acts is not enough for a pattern." Dkt. 41 at 19. They cite to cases from the Seventh Circuit which are factually and legally distinguishable. *Id.* (citing *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 342 (7th Cir. 2019), *cert. denied*, 206 L. Ed. 2d 825 (Apr. 20, 2020) (holding that fraud allegations which only harmed two individuals "who allegedly fell victim to the same fraudulent scheme . . . at the same time" during a closed time period in the past failed to establish a pattern under RICO); *U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1268–69 (7th Cir. 1990) (holding that fraud allegations relating back to a single contract during a closed time period in the past did not establish a pattern for RICO purposes); *Lipin Enters. Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986) (holding that fraud allegations relating to defrauding only "one victim . . . on one occasion" did not amount to a pattern under RICO)). Therefore, the court rejects this argument. The motions to dismiss on this ground are DENIED.

### 4. Causation

RICO plaintiffs are required to show that "the defendant's violation not only was a 'but for' cause of his injury . . . but was the proximate cause as well." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268, 112 S. Ct. 1311 (1992). RICO plaintiffs must prove that there is a "sufficiently direct relationship between the defendants' wrongful conduct and the plaintiff's injury" to satisfy the requirements of the proximate cause analysis. *See Bridge*, 553 U.S. at 657–58. But "[p]roximate cause . . . is a flexible concept that does not lend itself to 'a black letter rule that will dictate the result in every case.'" *Id.* at 654 (quoting *Holmes*, 503 U.S. at 272 n.20).

The RICO statute requires plaintiffs to "allege[] each element of the violation" but "requires no more than this." *Sedima*, 473 U.S. at 496–97. "Where the plaintiff alleges each

element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to cause a pattern, for the essence of the violation is the commission of those acts in connection with . . . an enterprise." *Id.* For RICO claims based on mail or wire fraud, plaintiffs do not have to plead reliance, first-hand or otherwise, to prove proximate cause. *See Bridge*, 553 U.S. at 648 ("Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation."); *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) ("The Supreme Court recently held that no reliance requirement exists for civil causes of action under RICO for victims of mail fraud.") (citing *Bridge*, 553 U.S. at 639); *Allstate Ins. Co.*, 802 F.3d at 676 ("In cases predicated on mail or wire fraud, reliance is not necessary.").

The PBM Defendants assert that Harris County's RICO claims should be dismissed because they cannot prove reliance, and thus, cannot prove proximate causation. Dkt. 41 at 16–17. The primary case to which they cite for the proposition that some level of reliance is required by RICO plaintiffs to show proximate cause addressed the issue of whether plaintiffs in a class action were entitled to an inference of reliance to show that reliance was common to the entire class. *Id.* at 16 (citing *Torres v. S.G.E. Mgmt., L.L.C.*, 805 F.3d 145, 151 (5th Cir. 2015), *on reh'g en banc*, 838 F.3d 629 (5th Cir. 2016)). In the case the PBM Defendants cite, the Fifth Circuit declined to address the extent to which reliance was required in a civil RICO case because the plaintiffs "concede[d] that proximate cause in their case depend[ed] on reliance." 805 F.3d at 151. On rehearing en banc, the Fifth Circuit reiterated that there is no reliance requirement for civil RICO claims. *Torres*, 838 F.3d at 637. The other case to which the PBM Defendants cite is a state court fraud case that has nothing to do with RICO claims. Dkt. 41 at 16 (citing *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Ctr. E., Inc.*, 290 S.W.3d 554, 566 (Tex. App.—Dallas 2009,

no pet.).  Thus, the court rejects the argument that Harris County has not adequately pled causation because it has not pled reliance[13] for two reasons: (1) RICO plaintiffs alleging mail and wire fraud are not required to show reliance, and (2) even if they were required to show some type of reliance, Harris County has adequately pled reliance.  *See Bridge*, 553 U.S. at 658 ("In most cases, the plaintiff will not be able to establish even but-for causation if *no one* relied on the misrepresentation." (emphasis added)).

Harris County alleges that it overpaid for diabetes medications which were artificially overpriced as a result of the Insulin Pricing Scheme.  Dkt. 20, 59–74.  Harris County relied on the PBM Defendants' alleged misrepresentations that they could and would save Harris County money by negotiating on its behalf for the at-issue drugs.  *Id.* at 60–61.  Additionally, Harris County relied on the PBM Defendants' alleged misrepresentation that their drug formulary lists were created and maintained to promote client safety and health—not as part of an alleged *quid pro quo* arrangement between the PBM Defendants and the Manufacturer Defendants to exchange money in the form of rebates for preferred placement on formulary lists.  *Id.* at 76–124.  The PBM Defendants' drug formulary lists were utilized by Harris County to determine pricing for the at-issue medications, and Harris County was allegedly purposefully overcharged by the PBM Defendants and paid that overcharge directly to the PBM Defendants.  *Id.* at 90.  The PBM Defendants were allegedly only able to use the artificially inflated prices "as a basis for the price Harris County paid . . . because Harris County relied on Defendants' misrepresentations and believed that the price[s] it paid

---

[13] As part of the causation analysis, the PBM Defendants argue that the court should consider Harris County's original petition filed in state court.  Dkt. 41 at 17.  The court declines to consider Harris County's original petition because "an amended complaint ordinarily supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading." *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985).

w[ere] reasonable and resulted from competitive market forces." *Id.* at 70–71.  Harris County alleges that the PBM Defendants knew that the prices of the at-issue medications were the result of the Insulin Pricing Scheme—not competitive market forces—and purposefully "exploit[ed] their market power to cause substantial increases in the price[s] of diabetes medications in order to create massive profits for themselves and [the] Manufacturer Defendants." *Id.* at 5.  Accordingly, the court finds that Harris County has adequately pled both but-for causation and proximate causation because they have alleged that their injuries would not have occurred but for the PBM Defendants' conduct and they have shown a direct relationship between the alleged conduct and their injury.[14]

The PBM Defendants also argue that Harris County has not adequately pled causation because Harris County's complaints are "dressed in RICO clothing" but actually are "governed by . . . contracts."  Dkt. 41 at 17–18.  The court rejects this argument because Harris County is not arguing that it did not know about the rebates that the PBM Defendants received or that a specific contract has been breached.  Dkt. 48 at 35.  Instead, Harris County is alleging that the PBM Defendants misrepresented that the rebates were for Harris County's benefit and that the rebate system existed to lower prices of diabetes medications for Harris County.  Dkt. 20 at 61.  Harris County alleges that the PBM Defendants misleadingly relabeled rebates so as to avoid paying them to Harris County.  *Id.* at 57.  Harris County also alleges that the PBM Defendants and the Manufacturer Defendants conspired to artificially raise the price of insulin in a *quid pro quo* exchange which led to Harris County overpaying for diabetes medications.  *Id.* at 5, 52, 79, 95,

---

[14] In their motion to dismiss, the Manufacturer Defendants do not argue that Harris County has not adequately alleged causation as to the Manufacturer Defendants' alleged conduct.

111.  Harris County's RICO claim is not a disguised claim for breach of contract.  Dkt. 20.

Accordingly, the motion to dismiss on this ground is DENIED.

### 5. RICO Conspiracy Claim

Section 1962(d) of RICO prohibits conspiring to violate RICO.  18 U.S.C. § 1962(d).  "To

demonstrate a civil RICO conspiracy, a claimant must show that: (1) two or more persons agreed

to commit a substantive RICO offense, and (2) the defendant knew of and agreed to the overall

objective of the RICO offense."  *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 551 (5th Cir. 2012).

The elements of a RICO conspiracy can be established through circumstantial evidence because

conspirators typically try to conceal their conduct.  *See, e.g.*, *United States v. Delgado*, 401 F.3d

290, 296 (5th Cir. 2005); *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).  Alleged

conspirators "need only have known of and agreed to the overall objective of the RICO offense."

*Delgado*, 401 F.3d at 296.

The PBM Defendants argue that the § 1962(d) claim for conspiracy to violate RICO should

be dismissed because Harris County has not adequately pled its § 1962(c) claim and has not pled

facts that suggest a conspiracy to violate RICO.  Dkt. 41 at 25.  The court has already concluded

that Harris County has adequately pled a § 1962(c) claim.  The court also finds that Harris County

has adequately pled a § 1962(d) claim.  Harris County alleges that the Manufacturer Defendants

and the PBM Defendants agreed to artificially inflate the reported prices of diabetes medications

in a scheme to defraud Harris County and other health plans.  Dkt. 20 at 76–124.  As proof of that

agreement, Harris County contends that the Manufacturer Defendants increased their reported

prices in lockstep with each other on multiple occasions and argues that the prices of the at-issue

medications only increased after PBMs began playing a more powerful role in the pharmaceutical

industry in 2003.  *Id.* at 31–40.  Harris County does not merely allege parallel conduct; it alleges

that both groups of defendants engaged in a *quid pro quo* exchange of rebates for preferred formulary list placement. *Id.* at 51. Harris County pleads facts that suggest a preceding agreement between the Manufacturer Defendants and the PBM Defendants. *See In re Insulin Pricing*, 2019 WL 643709, at *7 (holding that plaintiffs had adequately pled a RICO conspiracy by "assert[ing] facts that suggest[ed] a preceding agreement" and "alleg[ing] separate conspiracies of pricing enterprises"). Accordingly, the motion to dismiss on these grounds is DENIED.

### 6. Indirect-Purchaser Rule

Both the Manufacturer Defendants and the PBM Defendants contend that Harris County's RICO claims are barred by the indirect-purchaser rule. Dkts. 40, 41. The U.S. Supreme Court laid the foundation for the indirect-purchaser rule in *Hanover Shoe* when it rejected the "passing-on defense" of an antitrust defendant who argued that the plaintiff could not recover treble damages for costs which were ultimately "passed on" to its customers. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494, 88 S. Ct. 2224 (1968). In *Illinois Brick*, the Court examined a related issue: whether an indirect-purchaser plaintiff could offensively use a "pass-on theory" against an alleged antitrust violator. *Ill. Brick*, 431 U.S. at 726. The State of Illinois and hundreds of local governmental entities brought suit against a group of manufacturers who had allegedly engaged in a price-fixing conspiracy involving overpriced concrete blocks in violation of the Sherman Act. *Id.* The State of Illinois did not purchase the blocks directly from the manufacturers. *Id.* Instead, the manufacturers sold the blocks to masonry contractors who then used the blocks to build masonry structures. *Id.* General contractors then purchased those structures and used them to build entire buildings, which they sold to the State of Illinois. *Id.* The Court held that the state's purchases of the concrete blocks were too far down the distribution chain for the state to bring suit against the manufacturers. *Id.* at 735. The Court reasoned that allowing indirect

26

purchasers several steps down the distribution chain to bring suit against an entity further up the distribution chain would result in multiple liability for defendants and "massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 740. Thus, under *Illinois Brick*, only direct purchasers can bring suit against alleged antitrust violators. *Id.* at 735.

Harris County urges the court not to apply the indirect-purchaser rule to this case because the Fifth Circuit has never explicitly addressed the issue of whether the indirect-purchaser rule applies to RICO claims. Dkt. 48 at 21. Harris County requests instead that the court follow the minority rule articulated in *In re: EpiPen*, which allows RICO plaintiffs to establish standing to assert a RICO claim even if plaintiffs are indirect purchasers. Dkt. 48 at 22–23; *see In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1325 (D. Kan. 2018).

The Supreme Court has never addressed the issue of whether the indirect-purchaser rule applies to RICO claims, but in *Holmes*, the Court applied antitrust principles to the issue of causation in RICO claims. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. at 265–68. The Court reasoned that "Congress modeled § 1964(c) [of RICO] on the civil-action provision of the federal antitrust laws" and thus had intended for the language in RICO "to have the same meaning that courts had already given" that language in interpreting antitrust laws. *Id.* at 267–68. Harris County argues that, in contrast to *Holmes*, *Illinois Brick* was decided after RICO was adopted and thus Congress "could not have known about and intended to invoke *Illinois Brick*'s indirect-purchaser rule in the same way that it knew about and intended to invoke common law proximate cause principles." Dkt. 48 at 22. The *In re: Epipen* court reasoned that the U.S. Supreme Court only extended antitrust proximate cause rules to RICO claims and that the *Holmes* Court's decision did

not necessarily suggest that all antitrust principles should apply to RICO cases. 336 F. Supp. 3d at 1324–1325. However, the U.S. Supreme Court has "repeatedly observed that Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws." *Holmes*, 503 U.S. at 267 (citations omitted). Thus, the court declines to question the Supreme Court's holding in *Holmes* that suggests that antitrust principles apply to RICO claims.

Accordingly, the court declines to follow the minority rule and is inclined to follow the three circuit courts that have addressed this issue and held that indirect purchasers lack standing under RICO. *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("[I]ndirect purchasers lack standing under RICO . . . to sue for overcharges passed on to them by middlemen."); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("[A]ntitrust standing principles apply equally to allegations of RICO violations."); *Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985) ("The *Hanover Shoe–Illinois Brick* rule promotes enforcement and therefore applies to RICO, too."). The court holds that the *Illinois Brick* Court's bar on indirect-purchaser suits applies to RICO claims.

Both the Manufacturer Defendants and the PBM Defendants argue that Harris County is not a direct purchaser of diabetes medications and that the indirect-purchaser rule in *Illinois Brick* bars Harris County from asserting a RICO claim. Dkts. 40, 41. Each group of defendants submits hundreds of pages of factual allegations, which Harris County disputes, in an attempt to show that Harris County is not a direct purchaser. *Id.* Among other assertions, the Manufacturer Defendants allege that "PBMs do not purchase prescription drugs themselves, nor do they make any payments to drug manufacturers." Dkt. 40 at 7. They also claim that "[i]nsurers, health plans, and PBMs are not involved in the distribution chain" and that PBMs "do not take physical possession of medication." *Id.* at 5. Both the Manufacturer Defendants and the PBM Defendants point to the

28

distribution chain as evidence that Harris County is not a direct purchaser. *Id.* Harris County asserts in response that "[t]he distribution chain . . . is not at-issue [sic] in this case . . . ." Dkt. 48 at 15.  Instead, Harris County's claims are about the pricing chain.  Dkt. 20 at 40.  Because the Manufacturer Defendants and the PBM Defendants play different roles in the pricing chain, the court analyzes them separately and will address the Manufacturer Defendants in the next subsection. *See* Part III.A.7, *infra*.

The court will not address the many factual disputes in the record between the parties at this early stage in the case.  At the motion to dismiss stage, the court must accept the plaintiff's allegations as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) ("[W]e must accept as true all well pleaded facts in the complaint, and the complaint is to be liberally construed in favor of the plaintiff.").  According to Harris County, "[t]he pharmaceutical industry . . . is unique in that the pricing chain is distinct from the distribution chain." Dkt. 20 at 40.  PBMs "contract with a network of retail pharmacies.  Pharmacies agree to dispense drugs to patients and PBMs pay the pharmacies for the drugs dispensed." *Id.* at 42.  The PBM Defendants also allegedly make money by providing pharmaceutical drugs directly by "operat[ing] their own highly profitable [mail-order] pharmacies." *Id.* at 59.  According to the complaint, "the higher the price that [the] PBM Defendants are able to get their customers, such as health plans like Harris County, to pay for diabetes medications, the higher the profit [the] PBM Defendants realize through their own [mail-order] pharmacies." *Id.*  Many PBMs "own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at issue here, and directly supply those drugs to patients by mail." *Id.* at 42.  Harris County alleges that it pays the PBM Defendants *directly* for the overcharges of the diabetes medications at issue in this case, "not an intervening distributor or other link in the distribution chain." Dkt.

48 at 13. Harris County also allegedly pays PBMs to manage the administrative burden of its pharmaceutical program and relies on PBMs to control drug costs, and only the "PBM Defendants control which insulin products are available to consumers." Dkt. 20 at 74, Dkt. 48 at 14. Accordingly, the court holds that Harris County is not an indirect purchaser under *Illinois Brick*, and its RICO claims against the PBM Defendants are not barred by the indirect-purchaser rule.

The Supreme Court's most recent decision involving the indirect-purchaser rule helps elucidate the court's finding that Harris County's RICO claims against the PBM Defendants are not barred by *Illinois Brick*. In *Apple Inc. v. Pepper*, iPhone users who purchased apps from Apple's app store brought suit against Apple for allegedly violating antitrust laws by using its app store to overcharge consumers. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1518 (2019). Apple argued that the consumer plaintiffs were indirect purchasers and did not have standing to pursue their claims because "app developers, not Apple, set the retail price charged to consumers." *Id.* at 1521. The Supreme Court rejected Apple's argument and held that the consumer plaintiffs were not barred under the indirect-purchaser rule because they paid the overcharges directly to Apple and there was no intermediary in the distribution chain between them. *Id.* at 1522. The Court was similarly unpersuaded by Apple's argument that the consumer plaintiffs should be barred by the indirect-purchaser rule because damages would be difficult to calculate and other potential plaintiffs in the distribution chain could also sue Apple for their allegedly anticompetitive behavior. *Id.* at 1524. The Court noted that "*Illinois Brick* is not a get-out-of-court-free card for monopolistic retailers to play any time that a damages calculation might be complicated." *Id.*

In the present case, taking the facts alleged in the complaint as true, only the Manufacturer Defendants and the PBM Defendants control the price Harris County pays for the drugs at issue, and they have allegedly conspired to artificially inflate those prices for their own gain. Dkt. 20 at

30

74.  Allegedly the PBM Defendants sell diabetes medications directly through their own mail-order pharmacies.  *Id.* at 59.  Like in *Apple* where "[t]he absence of an intermediary [was] dispositive," there is no intervening distributor or other link in the chain between Harris County and the PBM Defendants.  139 S. Ct.  at 1521; Dkt. 20 at 42.  Like in *Apple* where the Court was persuaded by the fact that the plaintiff consumers paid the overcharges directly to Apple, the allegations that Harris County pays its overcharges directly to the PBM Defendants are dispositive at this stage.  *See* Dkt. 48 at 15.

The PBM Defendants point to district court cases in New Jersey in which the plaintiffs made similar allegations against insulin manufacturers as evidence that Harris County is not a direct purchaser.  Dkts. 40 at 14, 41 at 8.  The court is not bound by those cases, and they are nevertheless distinguishable in regard to the direct-purchaser rule analysis.  In *MSP Recovery Claims*, the plaintiffs' complaint alleged a chain of distribution similar to the distribution chain in *Illinois Brick* and conceded that there were multiple intermediaries between the plaintiffs and the defendants; they did not allege that they paid overcharges directly to defendants as Harris County alleges here.  *MSP Recovery Claims*, 2019 WL 1418129, at *13–14; *see also Minn. by Ellison v. Sanofi-Aventis U.S. LLC*, 2020 WL 2394155, at *9 (holding that the State of Minnesota was barred by the indirect purchaser rule from pursuing claims against insulin manufacturers because the state did not allege that they purchased insulin from any defendants).  In *In re Insulin Pricing*, the plaintiffs were "individuals . . . who filed . . . on behalf of themselves and a proposed nationwide class of analog insulin consumers," not healthcare providers like Harris County.  *In re Insulin Pricing*, 2019 WL 643709, at *1.  The plaintiffs in that case also did not allege that they paid overcharges directly to defendants as Harris County alleges here.  *Id.* at *8 ("Plaintiffs' Complaint merely alleges that Defendants' artificial price inflation . . . caused them to pay an increased price

for analog insulin, yet never alleges that such overpayments were made directly to Defendants."). Because Harris County claims that 1) it pays the PBM Defendants directly for alleged overcharges and 2) the PBM Defendants supply some of the at-issue drugs directly to Harris County through the PBM Defendants' mail-order pharmacies, *Illinois Brick* does not bar Harris County from pursuing its RICO claims against the PBM Defendants at this stage in the litigation. Thus, the PBM Defendants' motion to dismiss on this ground is DENIED.

### 7. Co-Conspirator "Exception"

In contrast to its allegations against the PBM Defendants, Harris County does not allege that it pays any overcharges directly to the Manufacturer Defendants. Dkt. 20. Harris County has not alleged that the Manufacturer Defendants sell insulin through mail-order pharmacies or that Harris County pays any amount of money directly to the Manufacturer Defendants. *Id.* Thus, there are intermediaries between Harris County and the Manufacturer Defendants. *Id.* However, Harris County alleges that the Manufacturer Defendants and the PBM Defendants have conspired to artificially raise prices of insulin and other diabetes medications, and *Illinois Brick* does not bar indirect purchasers from filing suit against co-conspirators in an alleged price-fixing conspiracy. *Id.* at 48–55.

Federal courts have long recognized an exception to *Illinois Brick*'s indirect-purchaser rule when plaintiffs allege that they purchased directly from a co-conspirator in a price-fixing conspiracy. *See, e.g.*, *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631–32 (7th Cir. 2002) (holding that the first purchaser from outside the conspiracy is the "right party to sue"); *State of Ariz. v. Shamrock Foods Co.*, 729 F.2d 1211, 1215 (9th Cir. 1984) ("*Illinois Brick* does not prevent . . . price-fixing claim[s]."); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 482 (S.D.N.Y. 2012) (holding that the first purchasers who are not part of the conspiracy are entitled

to collect damages); *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, No. CV H-05-3394, 2006 WL 8445718, at *12 (S.D. Tex. Sept. 14, 2006), *report and recommendation adopted*, 2006 WL 8445720 (S.D. Tex. Oct. 18, 2006); *Reiter v. Sonotone Corp.*, 486 F. Supp. 115, 119–20 (D. Minn. 1980) (holding that an allegedly overcharged plaintiff was not barred by *Illinois Brick* because the plaintiff paid the overcharge directly to a member of an alleged price-fixing conspiracy). In the *Paper* case, the Seventh Circuit reasoned that "it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages" rather than carving out an exception explicitly. 281 F.3d 631–32. The court finds the Seventh Circuit's reasoning compelling and applies it here. Harris County alleges that it is the first non-conspirator in the pricing chain because it pays overcharges for diabetes medications directly to the PBM Defendants—overcharges which Harris County alleges are based on prices which the PBM Defendants and the Manufacturer Defendants conspired to inflate for their own gain. Dkt. 20 at 76–124; Dkt. 48 at 14.

Harris County's allegations are similar to the plaintiffs' allegations in *Shamrock Foods*. *Shamrock Foods Co.*, 729 F.2d at 1211. In *Shamrock Foods*, the plaintiff consumers alleged that grocery stores conspired with dairy producers to fix the price of dairy products. *Id.* Like in *Shamrock Foods*, Harris County confines its damages to the alleged overcharges resulting from the alleged price-fixing conspiracy. *Compare id.* at 1214, *with* Dkt. 20 at 71. Thus, like in *Shamrock Foods*, the *Illinois Brick* Court's concerns about apportionment problems are not present here. 729 F.2d at 1214. Like in *Shamrock Foods*, Harris County alleges that the PBM Defendants and the Manufacturer Defendants conspired to fix the price Harris County pays for diabetes medications and are solely "responsible for the reported prices on which Harris County's payments are based." Dkt. 20 at 76–124; *compare* 729 F.2d at 1211, *with In re ATM Fee Antitrust Litig.*,

686 F.3d 741, 751 (9th Cir. 2012) (holding that the co-conspirator exception did not apply because plaintiffs did not directly pay alleged overcharges and the plaintiffs' theory of liability was based on "pass-on damages"), *and McCarthy, Inc.*, 80 F.3d at 852 (holding that the co-conspirator exception did not apply because plaintiffs did not directly pay alleged overcharges).

The PBM Defendants also argue that the Fifth Circuit's decision in *In re Beef* shows that the co-conspirator exception is inapplicable here because there is a risk of multiple liability. Dkt. 41 at 7 (citing *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979)). They argue that Harris County has admitted that there is a risk of multiple liability here by noting that there are other participants in the pharmaceutical industry who have been impacted by the defendants' alleged conspiracy. Dkt. 41 at 7. But "*Illinois Brick* did not purport to bar multiple liability that is unrelated to passing an overcharge down a chain of distribution." *Apple*, 139 S. Ct. at 1525. Harris County does not allege that it has been injured by virtue of a "passing-on" of overcharges as in *Illinois Brick*. Dkt. 20 at 90; Dkt. 48 at 14. Instead, Harris County alleges that it pays overcharges directly to an alleged co-conspirator, the PBM Defendants, in a price-fixing conspiracy between the PBM Defendants and the Manufacturer Defendants. *Id.* If others have been separately injured by the defendants' alleged conduct, that has no bearing on this case. Further, *In re Beef* did not answer the question of whether allegations of a price-fixing conspiracy could avoid the bar of *Illinois Brick*. 600 F.2d at 1161. The *In re Beef* court declined to address the issue because the plaintiffs in that case did not include arguments about the co-conspirator exception in their complaint and "no agreement to fix prices [was] alleged." *Id.* Thus, the court holds that Harris County is not barred by *Illinois Brick* in proceeding with its RICO claim against the Manufacturer Defendants. The motion to dismiss on this ground is DENIED.

### B. DTPA and Fraud Claims

Harris County also alleges that the Manufacturer Defendants and the PBM Defendants violated the Texas Deceptive Trade Practices-Consumer Protection Act (the "DTPA").  Dkt. 20 at 142; Tex. Bus. & Com. Code Ann. § 17.41.  "[C]laims alleging misrepresentation and fraud in violation of the . . . DTPA are subject to the heightened pleading requirements of Rule 9(b)."  *Mt. Olive Missionary Baptist Church v. Underwriters at Lloyd's, London*, No. CV H-16-234, 2016 WL 4494439, at *4 (S.D. Tex. Aug, 26, 2016).  "Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not."  *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001).  "Put simply, Rule 9(b) requires the complaint to set forth the 'who, what, when, where, and how' of the events at issue."  *See Dorsey*, 540 F.3d at 339; *see also supra* Part II.B.

Both the PBM Defendants and the Manufacturer Defendants contend that Harris County's DTPA claims do not meet the heightened pleading standards of Rule 9(b).  Dkt. 40 at 33–34; Dkt. 41 at 35.  Harris County does not dispute that Rule 9(b) applies, but it argues that it adequately pleads the "who, what, when, where, and how" of its DTPA claim.  Dkt. 48 at 44–45.  The court disagrees.  "[T]hrowing out a narrative account of the facts and then separately citing to statutes but putting the onus on the court or defendant to determine which facts might support which legal claims is deficient pleading."  *Click v. State Farm Lloyds*, No. 1:17-CV-00108-BL, 2018 WL 1322167, at *3 (N.D. Tex. Mar. 13, 2018).  In a conclusory fashion, Harris County lists sections of the DTPA which it alleges that the Manufacturer Defendants and the PBM Defendants have violated; it does not include any factual allegations, except by reference to the "preceding

paragraphs."[15]  Dkt. 20 at 142.  Further, the DTPA generally does not allow claims which arise

"from a transaction, a project, or a set of transactions relating to the same project, involving total

consideration by the consumer of more than $500,000."  Tex. Bus. & Com. Code § 17.49(g).  The

PBM Defendants argue that "[i]t is implausible . . . that the contracts through which the County

obtained PBM services or purchased insulin for Harris County jails would be small enough to

qualify for protection under the DTPA."  Dkt. 41 at 34.  Harris County does not address this issue

in its complaint.  Dkt. 20.  In its response, Harris County addresses it only by arguing that the total

amount of the transactions between Harris County and the defendants is a disputed fact that cannot

be resolved in a motion to dismiss.  Dkt. 48 at 42.  However, Harris County alleges no facts about

the amount of the transactions for the defendants to dispute.  Harris County must plead sufficient

facts to demonstrate that the statute applies.  Harris County does not adequately describe the "who,

what, when, where, and how" of its DTPA claims in accordance with Rule 9(b).  Therefore, the

motions to dismiss the DTPA claims are GRANTED.  Harris County moves for leave to amend,

and the motion for leave to amend as to this claim is GRANTED.

    In contrast to its DTPA claims, Harris County pleads its fraud claim with the particularity

required by Rule 9(b) because it connects its fraud claim to specific alleged facts in the

complaint— it does not merely incorporate all paragraphs by reference.  Dkt. 20 at 144.  To prevail

on a common-law fraud claim, a plaintiff must show that a defendant made a false material

representation which the defendant knew was false or was made "recklessly as a positive assertion

without any knowledge of its truth."  *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d

573, 577 (Tex. 2001).  A plaintiff must also show that the defendant "intended to induce [the

---

[15] Harris County provides facts related to the DTPA claims in its response to the defendants' motions to dismiss, but this is not sufficient under Rule 9(b).  Dkt. 48; *see supra* Part II.B.

plaintiff] to act upon the representation" and that the plaintiff "actually and justifiably relied upon the representation and thereby suffered injury." *Id.* Harris County contends that the Manufacturer Defendants worked with the PBM Defendants in a coordinated effort to artificially inflate reported prices for diabetes medications and then publish those artificially inflated prices in a *quid pro quo* of money for preferred placement on formulary lists. Dkt. 20 at 47. In cases with similar facts, federal courts have held that the act of publishing artificially inflated prices itself can constitute a fraudulent statement. *See, e.g.*, *MSP Recovery Claims*, 2019 WL 1418129, at *19 (holding that plaintiffs had adequately pled common-law fraud by alleging that defendants had engaged in "material, factual misrepresentations" by publishing intentionally inflated prices for insulin); *In re Lupron Mktg. & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 167 (D. Mass. 2003) ("[D]efendants trumpeted a lie by publishing the inflated [prices], knowing (and intending) them to be used as instruments of fraud."). In its complaint, Harris County argues that both groups of defendants knew the prices were fraudulent and resulted from the alleged Insulin Pricing Scheme. Dkt. 20 at 68–71. The defendants allegedly intended to induce Harris County to overpay for diabetes medications by publishing artificially inflated prices upon which Harris County relied in purchasing the at-issue medications. *Id.* at 146. Harris County also argues that the PBM Defendants made numerous other purposeful misrepresentations specifically to induce Harris County to pay inflated prices for diabetes medications, allegations which included names of individual speakers, the content of the alleged misrepresentations, dates, and where and how those statements were made. *See supra* Part III.A.1; Dkt. 20 at 61–71; Dkt. 48 at 58. Thus, Harris County has adequately pled the "who, what, when, where, and how" of its fraud claim as required by Rule 9(b).

37

Both the Manufacturer Defendants and the PBM Defendants also argue that the fraud claim should be dismissed because Harris County has not adequately pled reliance or causation. Dkt. 40 at 35; Dkt. 41 at 38. Harris County has adequately pled causation. *See supra* Part III.A.4. For common-law fraud claims, reliance is a question of fact which is not appropriate for the court to address at this stage. *See, e.g.*, *Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623, 638 (S.D. Tex. 2007) (holding that "reliance is ordinarily a question for the fact-finder . . . it is not a proper matter for dismissal on the pleadings."); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 772 (S.D. Tex. 2007) (same); *1001 McKinney Ltd. v. Credit Suisse First Bos. Mortg. Cap.*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("Courts have uniformly treated the issue of justifiable reliance as a question for the factfinder."). Harris County claims its reliance was reasonable because the defendants had exclusive knowledge about the pricing of diabetes medications and purposefully concealed material facts from Harris County about the reported prices of the at-issue medications. Dkt. 20 at 146. That is enough at this stage. Thus, the motions to dismiss the common-law fraud claim are DENIED.

### C. Money Had and Received and Unjust Enrichment Claims

Harris County also alleges causes of action for money had and received and unjust enrichment. Dkt. 20 at 147–48. To establish a claim for money had and received, the plaintiff must show "that (1) [the] defendant holds money and (2) the money in equity and good conscience belongs to [the] plaintiff." *Tour Strategy LLC v. Star-Telegram, Inc.*, No. 4:18-CV-074-A, 2018 WL 3242280, at *4 (N.D. Tex. July 3, 2018). "A cause of action for money had and received is not based on wrongdoing but instead, 'looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another.'" *Doss v. Homecoming Fin. Network, Inc.*, 210 S.W.3d 706, 711 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied)

38

(quoting *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ)). A money had and received claim is "less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money which . . . belongs to the plaintiff." *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 813 (Tex. App.—Dallas 2012, no pet.) (quoting *United States v. Jefferson Elec. Mfg. Co.*, 291 U.S. 386, 402–03, 54 S. Ct. 443 (1934)). A plaintiff can recover under an unjust enrichment theory when a defendant "obtain[s] a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Both types of claims are quasi-contractual. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683 (Tex. 2000) ("Unjust enrichment claims are based on quasi-contract."); *Amoco*, 946 S.W.2d at 164 ("Money had and received . . . is a quasi-contractual action . . . .").

The defendants argue that unjust enrichment is not a cause of action in Texas. Dkt. 40 at 36; Dkt. 41 at 38. However, this court has held that unjust enrichment can be an independent cause of action. *See Mora v. Koy*, No. CIV.A. H-12-3211, 2013 WL 2289887, at *5 (S.D. Tex. May 23, 2013). "Although unjust enrichment is usually characterized as a basis for quantum meruit recovery, it can be [an] independent cause of action." *Id.* "Unjust enrichment occurs where the defendant wrongfully secures a benefit or passively receives a benefit which would be unconscionable to retain." *Id.* The motions to dismiss the unjust enrichment claim because it is not a distinct cause of action are DENIED.

The defendants also argue that the unjust enrichment and the money had and received claims should be dismissed because quasi-contractual claims require a "nexus" between the

plaintiff and the defendant, which they contend does not exist here.[16]  Dkt. 40 at 37; Dkt. 41 at 38–

39.  For an unjust enrichment claim, there must be "some underlying contact or nexus between the

plaintiff seeking the recovery and the defendant from whom the recovery is sought."  *Cty. of El*

*Paso, Tex. v. Jones*, No. EP-09-CV-00119-KC, 2009 WL 4730343, at *12 (W.D. Tex. Dec. 4,

2009).  The plaintiff must allege that "in some way, [the] dealings [between the parties] must have

been inequitable, in favor of the defendant and at the expense of the plaintiff."  *Id.*  Fraud is an

"active" form of unjust enrichment.  *Id.*  Harris County has adequately pled fraud allegations.  *See*

*supra* Part III.B.  Harris County contends that the defendants were unjustly enriched through the

defendants' allegedly fraudulent Insulin Pricing Scheme and that Harris County was the source of

that enrichment.  Dkt. 20 at 147–49.  Thus, Harris County has sufficiently pled a nexus between

the recovery they seek and the defendants' alleged enrichment.  The cases to which the defendants

cite are inapposite.  Dkt. 40 at 37 (citing *Davis v. Wells Fargo Bank, N.A.*, No. 6:11-CV-00047,

2014 WL 585403, at *3 (S.D. Tex. Feb. 14, 2014) (holding that plaintiffs were too remote to

recover because they did not allege that they were the source of the defendants' enrichment and

there was no connection between the defendants' gain and the plaintiffs' loss)); Dkt. 41 at 38–39

(citing *Jones*, 2009 WL 4730343, at *12) (holding that plaintiff who did not allege wrongdoing

against several defendants could not recover because defendants had not been unjustly enriched)).

The Manufacturer Defendants argue two additional reasons for dismissal of the unjust

enrichment and money had and received claims.  Dkt. 40 at 37.  They contend that (1) Harris

County has "fail[ed] to allege that the Manufacturer Defendants engaged in any unlawful conduct"

---

[16] The PBM Defendants again cite to Harris County's original petition in state court.  Dkt. 41 at
39.  The court again declines to consider Harris County's original petition because an amended
complaint supersedes the original.  *See supra* Part III.A.4. n.13.

and thus, "there is . . . no injustice to equitably correct," and (2) they never received money from

Harris County, and thus, they do not have money that could possibly belong to Harris County. *Id.*

The motion to dismiss on these grounds is DENIED because (1) Harris County has alleged

unlawful conduct, and the court must accept Harris County's allegations as true at this point in the

litigation, and (2) whether the Manufacturer Defendants have been unjustly enriched by Harris

County is a disputed question of fact which the court cannot address in a motion to dismiss.

Dkt. 20 at 147–149; *see supra* Part III.

Lastly, both groups of defendants argue that an express contract between the PBM

Defendants and Harris County governs the subject matter of the dispute, which forecloses the

possibility of recovery under a quasi-contract theory. Dkt. 40 at 37; Dkt. 41 at 38–39. When an

express contract covers the subject of a dispute, a plaintiff generally cannot recover under a quasi-

contract theory. *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 204 (5th

Cir. 2015). Harris County has not alleged a breach of contract claim and does not concede that the

subject matter of the disputes is governed by an express contract; it claims that its losses are part

of a larger fraudulent scheme. Dkt. 20 at 57–59. Nevertheless, "in some circumstances,

overpayments under a valid contract may give rise to a claim for . . . unjust enrichment." *N.

Cypress Med.*, 781 F.3d at 204 (quoting *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d

467, 469–70 (Tex.1998)); *Villarreal v. First Presidio Bank*, 283 F. Supp. 3d 548, 555 (W.D. Tex.

2017) ("[T]he Texas Supreme Court has made clear that the bar against quasi-contract or equitable

claims when there is an express writing defining the obligations of the parties is not an absolute

bar, but a general rule.").

Harris County has adequately alleged its money had and received and unjust enrichment

claims. Harris County alleges that the defendants conspired to artificially inflate prices of diabetes

medications in a *quid pro quo* of money for preferred formulary list placement.  Dkt. 20 at 47, 51.

Harris County contends that, as a result of the defendants' Insulin Pricing Scheme, it has overpaid

for diabetes medications by paying artificially inflated prices and that the defendants have been

unjustly enriched because Harris County has overpaid.  *Id.* at 148–49.  It is plausible that

defendants have been unjustly enriched through Harris County's alleged overpayments.  Likewise,

it is plausible that the defendants have money which rightfully belongs to Harris County.  Thus,

because the court takes the facts alleged in the complaint as true, the motions to dismiss the unjust

enrichment and money had and received claims are DENIED.

### D. Civil Conspiracy Claim

Lastly, Harris County alleges that the defendants conspired to commit the torts of fraud,

unjust enrichment, and money had and received.[17]  Dkt. 20 at 149.  Both groups of defendants

argue that the conspiracy claim should be dismissed because conspiracy is a derivative tort, and

Harris County has failed to adequately allege that the defendants engaged in any tortious conduct.

Dkt. 40 at 38; Dkt. 41 at 39–40.  The Manufacturer Defendants also contend that Harris County

has failed to show a "meeting of the minds."  Dkt. 40 at 38 (quoting *Juhl v. Arrington*, 936 S.W.2d

640, 644 (Tex. 1996)).  The court disagrees.  Harris County has adequately pled its claims for

fraud, unjust enrichment, and money had and received.  *See supra* Part III.B and Part III.C.  Harris

County has also adequately pled facts that suggest a "meeting of the minds" between the

Manufacturer Defendants and the PBM Defendants to engage in tortious conduct.  *See* Dkt. 20 at

31–40, 51, 76–124.  Thus, the motion to dismiss the civil conspiracy claim is DENIED.

---

[17] Harris County also alleged that the defendants conspired to violate the Texas Free Enterprise and Antitrust Act and the DTPA, but those claims have been dismissed.  *See supra* Part I n.3 and Part III.B.

**E. Injunctive Relief**

At the end of the complaint and in various sections throughout, the plaintiffs request injunctive relief in a conclusory manner, but the briefing is inadequate.  Dkt. 20 at 91–92, 107–08, 123–24, 134, 141, 144, 149–50.  The requests did not even include a recitation of the elements required for an injunction, much less briefing on those elements.  Therefore, the requests for injunctive relief are DENIED without prejudice.

### III. CONCLUSION

For these reasons, the defendants' motions to dismiss are GRANTED in PART and DENIED in PART.  The court GRANTS Harris County's request to amend the DTPA claim. Harris County shall file its amended complaint within fourteen days of this memorandum opinion and order.  Harris County's request for injunctive relief is DENIED without prejudice.


Signed at Houston, Texas on September 29, 2020.

Gray H. Miller
Senior United States District Judge