United States District Court
Southern District of Texas
**ENTERED**
February 16, 2022
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| HARRIS COUNTY, TEXAS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-19-4994 |
| | § | |
| ELI LILLY AND COMPANY *et al*., | § | |
| | § | |
| *Defendants*. | § | |

### MEMORANDUM OPINION AND ORDER

Pending before the court is Defendant OptumRx Inc.'s ("OptumRx") motion to dismiss. Dkt. 148. Having considered the motion, response, reply, briefings on supplemental authority, and applicable law, the court is of the opinion that the motion should be GRANTED.

### I. BACKGROUND

In its Fourth Amended Complaint (the "FAC"), the County alleges that a price-fixing conspiracy involving fifteen entities that either manufacture diabetes medications or manage and negotiate certain pharmacy benefits is behind the dramatic rise in drug costs. *See* Dkt. 127. In particular, the County sues Defendants Eli Lilly, Novo Nordisk, and Sanofi (the "Manufacturer Defendants") and CVS Caremark, Express Scripts, OptumRx, and Aetna Rx (the "PBM Defendants"). Though only OptumRx has thus far moved to dismiss the FAC, the court will briefly review the general contours of the price-fixing conspiracy allegedly behind the rising costs of diabetes medications and discuss the relationships between the Manufacturer Defendants and the PBM Defendants.

### A.  The Insulin Pricing Scheme

According to the FAC, Eli Lilly joins Novo Nordisk and Sanofi as the three principal companies that manufacture, promote, and distribute pharmaceutical drugs, including diabetes medications and various insulins.  *Id.* 8 ¶ 2.  Together, these Manufacturer Defendants produce the "vast majority" of diabetes medications on which approximately six million people across the country rely.  *See id.* 7–8 ¶¶ 1–2.  Though they only cost Manufacturer Defendants $5 to produce (and were marketed for $20 during the 1990s), today's insulins are priced between $300 and $700. *Id.* 8 ¶ 5.  Since 2003, the reported price of certain insulins has far outpaced inflation; some have increased by more than 1000%.  *Id.* 50 ¶ 234.  By 2016, the average price per month of the four most popular types of insulin rose to $450.  *Id.* ¶ 235.  For one drug, Humulin R (500U/ML), Eli Lilly has raised the price from $165 to $1,784 since 1999.  *Id.* ¶ 236.  For another, Humalog, Eli Lilly has raised the reported price for a package of the medication from less than $200 to $663 since 2008.  *Id.* 52 ¶ 237.  The County alleges that Manufacturer Defendants have "in lockstep raised the reported prices of their respective diabetes drugs."  *Id.* 8 ¶ 4, 56–61 ¶¶ 243–50.

The County also sues the PBM Defendants that "manage the pharmacy benefits for the vast majority of individuals in the United States" and "establish national formularies"—or lists of approved drugs for a given health plan—"that...set the baseline for which diabetes medications are covered by insurance and which are not."  *Id.* 8 ¶ 3, 20 ¶ 78, 95 ¶ 420.  The PBM Defendants "contract with payors" like the County.  *Id.*  85 ¶ 367.  A PBM develops the payor's drug formulary, processes claims, creates a network of retail pharmacies, sets the prices in coordination with the Manufacturers that the payor will pay for prescription drugs, and is paid by the payor to reimburse pharmacies for the drugs utilized by the payor's beneficiaries.  *Id.* 63 ¶ 265.  Harris

County "relies on PBMs as administrative agents, for the alleged purposes of limiting administrative burden and controlling pharmaceutical drugs costs." *Id.* 92 ¶ 406.

The County alleges that together, Manufacturer Defendants and PBM Defendants conspired "to create a secret spread"—known as the Insulin Pricing Scheme—"between the reported price for diabetic treatments (on which Harris County's payments are based) and the true net price of those same drugs." *Id.* 10 ¶ 10. In that sense, the "Insulin Pricing Scheme was designed to, and did, encourage others, including diabetics and payors...to advocate the use of [Manufacturer Defendants'] products and pay for those diabetes medications based on a fraudulently inflated price." *Id.* 121 ¶ 533.

At the heart of this conspiracy are what the County terms "Manufacturer Payments"— refunds (or kickbacks) in the form of "rebates, discounts, credits, concession fees, and the like that serve as a 'quid pro quo for formulary inclusion.'" *Id.* 11 ¶ 16. What payors and their health plans pay for a prescription drug is "directly tied to the reported price" that the Manufacturer Defendants and PBM Defendants have allegedly fixed. *See id.* ¶ 266, 62 ¶¶ 256–63. PBMs also contract with a network of retail pharmacies, which the PBMs pay after they dispense drugs to patients. *Id.* 64 ¶ 267. However, the amount PBMs pay to pharmacies is "not the same as the amount paid by the payor." *Id.* ¶ 268. Instead, payment is "negotiated...and not disclosed." *Id.* Sometimes, though, the PBM and the pharmacy operate as part of a larger whole, such as when the PBM owns a mail-order or specialty pharmacy. *See id.* ¶ 269. In those scenarios, the mail order pharmacy purchases and takes possession of the prescription drugs and directly supplies the drugs to patients by mail. *Id.* But, as a general matter, the PBMs "negotiate the price that payors pay for a prescription drug; they separately negotiate a different price that pharmacies receive for that same drug; and they also negotiate the amount the manufacturers pay back to the PBM for each drug sold." *Id.* ¶ 273.

Here is how the conspiracy between the Manufacturer Defendants and the PBM Defendants allegedly works: Manufacturer Defendants "artificially and willingly raise their reported prices" to gain formulary access "and then secretly refund a significant portion of that price back to PBM Defendants." *Id.* 11 ¶ 16. The PBM Defendants then grant formulary status based upon the highest inflated price and the largest refund amount. *Id.* ¶ 17. The Insulin Pricing Scheme enables Manufacturer Defendants "to buy their preferred formulary position—which significantly increases their revenue—without sacrificing their profit margins." *Id.* ¶ 18. At the same time, it enables PBM Defendants to profit from the inflated reported prices by retaining a significant percentage of the secret refund payments and "pocketing an additional pricing spread between what a payor pays the PBM for an insulin script based on the inflated price and a lower price that the PBM reimburses the pharmacy for the same drug." *Id.* 11–12 ¶ 19. The PBM Defendants also profit by using those same artificial prices in their own mail-order pharmacies and "charging pharmacies hidden fees based on the inflated price." *Id.*

According to the County, certain professional associations and conferences facilitate the conspiracy. For example, each Manufacturer Defendant is a member of the Pharmaceutical Research and Manufacturers of America ("PhRMA") and "has routinely communicated through PhRMA's meetings and platforms in furtherance of the alleged Insulin Pricing Scheme." *Id.* 68 ¶ 289. PBM and Manufacturer Defendants also use trade associations and industry conferences to "routinely communicate" with one another. *See id.* ¶ 291. One conference, the Pharmaceutical Care Management Association ("PCMA"), served as a central meeting place for the Insulin Pricing Scheme. *See id.* 69 ¶ 294. The current PCMA board includes executives from several PBM Defendants. *Id.* ¶ 293.

4

All PBM Defendants are "members" of the PCMA, and all Manufacturer Defendants are "affiliate members" of the organization.  *Id.* ¶ 295.  But the Manufacturer Defendants are more than just mere affiliate members.  According to the County, they are "Presidential Sponsors" of the PCMA conferences.  *Id.* ¶ 297.  As "Presidential Sponsors," the Manufacturer Defendants hosted "private meeting rooms" that offered "excellent opportunities for...one-on-one interactions between PBM and pharma executives."  *Id.* ¶ 298.  During the PCMA's annual meetings and business forums, "representatives from each Manufacturer Defendant met privately with representatives from each PBM Defendant, as well as their co-conspirator Cigna Pharmacy Management."  *Id.* ¶ 299, 69 ¶ 296.  Prior to, and in preparation for, these meetings, the County alleges that "dedicated teams of executives from each Defendant would spend weeks preparing PCMA 'pre-reads' and reports," allegedly "demonstrat[ing] the deep involvement of each Defendant in the Insulin Pricing Scheme" and the "tangled web that gave rise to the scheme."  *Id.* 69–70 ¶ 300.  In addition, "all PCMA members...are invited to join...an invitation-only LinkedIn Group and online networking community," that provided the defendants with a "year-round, non-public online forum" enabling them to further their conspiracy.  *Id.* ¶¶ 302–03.

From the County's perspective, these PCMA meetings are significant because "key at-issue lockstep price increases occurred shortly after [their conclusion]."  *Id.* 70 ¶ 302.  For example, on September 26 and 27, 2017, the PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms, and executives from both sets of defendants met throughout the conference.  *Id.* 70–71 ¶ 304.  Several days after the conference, on October 1, 2017, Sanofi increased the list prices for two medications, Lantus and Toujeo, by 3% and 5.4%, respectively. *Id.*  A few weeks later, Novo Nordisk approved a 4% list price increase for its drugs to match the Sanofi increase.  *Id.*  Years earlier, in 2014, a few weeks after a PCMA conference, Novo Nordisk

acted similarly by raising the list price of one of its medications, Levemir, several hours after Sanofi increased its list price.  *Id.* 71 ¶ 305.

### B.  Harris County and Its Injury

Harris County is a body corporate and politic under the laws of the State of Texas.  *Id.* 13 ¶ 30.  The County's government serves nearly five million residents.  *Id.* ¶ 31.  As an employer, the County provides health benefits to approximately 38,000 employees, retirees, and their dependents (collectively, "Beneficiaries").  *Id.* 13–14 ¶ 31.  Harris County reimburses its employees "for diabetes medications through their health plans" and purchases diabetes medications "to be administered directly in government-run facilities."  *Id.* 61 ¶ 251.  The County reimburses beneficiaries through its own self-funded health plan, meaning that it provides health benefits using its own funds, including those contributed by its Beneficiaries.  *Id.* 91 ¶ 403.  In addition, Harris County also purchases diabetes medications to administer directly to inmates in Harris County jails.  *Id.* 13–41 ¶ 31, 92 ¶ 404, 162 ¶ 172.

Neither Harris County nor the employees it reimburses ostensibly purchases the at-issue drugs from the drug manufacturer themselves.  That is because, as the County alleges, "[t]he prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures."  *Id.* 62 ¶ 256.  And, generally, the at-issue diabetes medications are "distributed from manufacturer to wholesaler, wholesaler to retail or mail-order pharmacy, and pharmacy to patient/consumer."  *Id.* ¶ 257.

Nevertheless, the County contends that "[a]t different periods during the relevant time, each of the PBM Defendants *in coordination with their co-conspirators*, provided PBM services to [the County]."  *Id.* 92 ¶ 407 (emphasis added).  In terms of direct relationships, the County contends that, from 2003 to 2010, AetnaRx provided PBM services to Harris County.  *Id.* ¶ 408.

Following CVS Caremark and Aetna's 12-year contract related to PBM services, AetnaRx and CVS Caremark coordinated to provide PBM services to the County from January 2011 through March 2017. *Id.* These services included developing and offering formularies for the County's prescription plan, constructing and managing the County's pharmacy network, processing pharmacy claims, and providing mail-order pharmacy services to the County. *Id.* In providing those services, AetnaRx and CVS Caremark "set the amount the County paid for the at-issue drugs in coordination with the Manufacturer Defendants and utilize[ed] the false price generated by the Insulin Pricing Scheme." *Id.* ¶ 409. Moreover, "[i]n providing these PBM services to Harris County, Aetna RX and CVS Caremark also received payments for the at-issue drugs and, in turn, reimbursed the pharmacies that dispensed drugs to Harris County beneficiaries." *Id.* 93 ¶ 410. As a general matter, the County maintains that no other intermediary in the pharmaceutical supply chain "has control over or is responsible for the reported prices on which nearly all diabetics and payors, including Harris County's payments, are based other than those involved in the conspiracy." *See id.* 151 ¶ 664.

### C. The County's Allegations Against OptumRx

OptumRx is named as a defendant in its capacity as a PBM and mail-order pharmacy.[1] *Id.* 36 ¶ 175. The County alleges that from March 2017 through 2019, OptumRx and Cigna Pharmacy Management worked in coordination to provide its PBM services. *Id.* 93 ¶ 411. Cigna is not

---

[1] From March 2017 through 2019, OptumRx managed the County's pharmacy network, which entailed processing pharmacy claims for prescriptions dispensed to Harris County's Beneficiaries and operated mail-order pharmacies that delivered prescription drugs to Harris County's Beneficiaries. Dkt. 127 at 92 ¶ 411. In OptumRx's capacity as a mail-order pharmacy, the County alleges that OptumRx "dispensed diabetes medications...nationwide and in Texas, including in Harris County." *Id.* 39 ¶ 189. The County does not allege that it directly purchased diabetes medications from OptumRx through its mail-order pharmacies. *See id.*

named as a defendant in this case and it appears that the County only directly contracted with it, not OptumRx.[2]  *See id.* ¶ 413.

While the County did not utilize any formularies developed by OptumRx, the latter's relationship with Cigna appears to date back to the days of its predecessor, Catamaran.  A frequent attendee of the PCMA conferences, Catamaran "entered into a contract with Cigna to become Cigna's 'exclusive pharmacy benefit partner' in a strategic 10-year agreement to provide PBM services to the more than 8 million Cigna clients and members."  *Id.* 37 ¶ 179, 70 ¶ 301.    In its capacity as the PBM for Cigna's clients, "Catamaran negotiated with drug manufacturers on behalf of Cigna with respect to rebates and formulary placement."  *Id.* 38 ¶ 180.  OptumRx continued to provide pharmacy benefit services to Cigna's customers and members after it acquired Catamaran in 2015.  *Id.* ¶ 181.

Harris County was one of Cigna's members and clients during the six years spanning 2013 and 2019 that OptumRx contracted with Cigna to provide PBM services.  *Id.* ¶ 182.  Due to its agreements with OptumRx, Cigna Pharmacy Management allegedly "utilized and profited from the specific false and inflated prices generated by the Insulin Pricing Scheme and has benefitted from OptumRx's at-issue conduct with regard to the at-issue drugs."  *Id.*

---

[2]    The County also alleges that following Cigna's merger with Express Scripts in December 2018 and Cigna Pharmacy Management's consolidation with Express Scripts, Express Scripts and Cigna Pharmacy Management worked in coordination to provide PBM services to Plaintiff Harris County.  Dkt. 127 at 93 ¶ 412.  These services included developing and offering formularies for the County's prescription plan, constructing and managing the County's pharmacy network, processing pharmacy claims, and providing mail-order pharmacy services to the County.  *Id.*  In providing these services to the Harris County, Express Scripts and Cigna Pharmacy Management set the amount the County paid for the at-issue drugs in coordination with the Manufacturer Defendants and utilizing the false price generated by the Insulin Pricing Scheme, received payments for the at-issue drugs and, in turn, reimbursed the pharmacies that dispensed drugs to Harris County beneficiaries.  *Id.* ¶ 413.  Cigna merged with defendant Express Scripts at an unstated date.  *See id.* 66 ¶ 283.

Even more generally, the County alleges that OptumRx "coordinates" with Eli Lilly, Novo Nordisk, and Sanofi "regarding the price of the at-issue diabetes medications, as well as for the placements of these firms' diabetes medications on [Defendant] Express Script's national formularies." *Id.* 36 ¶ 176. It alleges that OptumRx had "express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies." *Id.* 39 ¶ 190. The Manufacturer Defendants' executive teams even allegedly met with executives from OptumRx and its parent company, UnitedHealth Group, "to discuss their coordinated efforts related to the at-issue drugs." *Id.* 36 ¶ 177.

### D.     Procedural History

This case is entering its third year of life. After the defendants removed Harris County's initial complaint to this court on December 23, 2019, the County filed its First Amended Complaint on January 31, 2021. Dkt. 20. In the First Amended Complaint, Harris County brought claims under the federal Racketeer Influenced and Corrupt Organization Act ("RICO") pursuant to 18 U.S.C. §§ 1962, *et seq.*, the Sherman Act pursuant to 15 U.S.C. § 1, *et seq.*, the Texas Free Enterprise and Antitrust Act ("TFEAA") pursuant to Tex. Bus. & Com. Code Ann. §§ 15.01, *et seq.*, the Texas Deceptive Trades Practices-Consumer Protection Act, common law fraud, money had and received, unjust enrichment, and civil conspiracy. *Id.* On April 14, 2020, both Manufacturer Defendants and PBM Defendants moved to dismiss. Dkts. 40, 41.

On September 29, 2020, the court issued a Memorandum Opinion and Order (the "September 2020 Order") granting in part and denying in part the defendants' motions to dismiss. Dkt. 66. Apart from dismissing the County's DTPA claim (which it also permitted the County to

amend), the court denied the motions to dismiss. *See id.* at 36. With respect to the RICO claims, the court concluded that the indirect purchaser bar articulated in the Supreme Court's *Illinois Brick* decision did not preclude the County's claims because the County "allege[d] that it pa[id] the PBM Defendants directly for the overcharges of the diabetes medications…not an intervening distributor or other link in the distribution chain." *Id.* at 29 (internal quotations omitted).[3]

On October 13, 2020, Harris County filed its Second Amended Complaint. Dkt. 68. The defendants collectively moved to dismiss the County's DTPA claims on November 20, 2020. Dkt. 76. The court denied their motion on March 25, 2021 (the "March 2021 Order"). Dkt. 82. The County amended its complaint again on July 27, 2021. Dkt. 110. Though several defendants answered the County's Third Amended Complaint, *see* Dkts. 111–15, the County moved for leave to file the instant Fourth Amended Complaint on August 25, 2021. Dkt. 118. The court granted the County's motion and the County subsequently filed its FAC on September 27, 2021. Dkts. 126, 127. OptumRx filed its motion to dismiss under Rule 12(b)(6) on October 18, 2021. Dkt. 148.

---

[3]    In concluding that the County "allege[d] that it pa[id] the PBM Defendants directly," the court cited the County's response to the defendants' motions to dismiss. *See* Dkt. 66 at 29 (citing Dkt. 48 at 13). That portion of the County's motion argued that "Harris County paid…the at-issue overcharges to the PBMs, not an intervening distributor or other link in the distribution chain." Dkt. 48 at 13. However, the Fifth Circuit has instructed that, with limited exception not applicable here, a "district court may not go outside the complaint" when deciding a Rule 12(b)(6) motion. *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). The portion of the First Amended Complaint that lent the most support to the County's assertion that it directly paid the PBM defendants is found in paragraph 207, which explained that "[a] PBM develops the health plan's drug formulary…and is paid by the health plan for the drugs utilized by the health plan's beneficiaries." Dkt. 20 at 44 ¶ 207.

## II. Legal Standard

### A. Rule 12(b)(6)

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007).  At the pleading stage, the court must "accept all well-pleaded facts in the complaint as true and view the facts in the light most favorable to the plaintiff." *O'Daniel v. Indus. Serv. Sols.*, 922 F.3d 299, 304 (5th Cir. 2019).  "Motions to dismiss are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).  In considering a motion to dismiss, usually the court "may rely on only the complaint and its proper attachments." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

## III.  Analysis

The County brings eight claims against OptumRx.  It alleges one claim each that OptumRx violated the federal RICO statute, 18 U.S.C. § 1962(c), for its participation in the Eli Lilly-PBM RICO enterprise, the Novo Nordisk-PBM RICO enterprise, and the Sanofi-PBM enterprise.  Dkt. 127 at 110–11 ¶¶ 488–91, 124 ¶¶ 548–53, 139 ¶¶ 612–17.  It also alleges OptumRx violated RICO, 18 U.S.C. §§ 1962(c)–(d), by facilitating the Insulin Pricing Scheme through its respective RICO enterprises. *Id.* 153 ¶¶ 676–85.  Finally, it brings four state law claims for violations to the Texas Deceptive Trades Practices-Consumer Protection Act ("DTPA"), money-had-and-received; unjust enrichment; and civil conspiracy. *Id.* 155–68 ¶¶ 686–724.  The court grants OptumRx's motion to dismiss for each claim.

### A.  RICO Standing

Antitrust standing principles apply equally to allegations of RICO violations.  Dkt. 66 at 27–28. *See also Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268–70, 112 S.Ct. 1311

(1992) ("We may fairly credit the 91ˢᵗ Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4."); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("The precepts taught by *Illinois Brick* and *Utilicorp* apply to RICO claims, thereby denying RICO standing to indirect victims."); *Wooten v. Loshbough*, 951 F.2d 768, 770 (7th Cir. 1991); *County of Oakland v. City of Detroit*, 866 F.2d 839, 851 (6th Cir. 1989), *cert. denied*, 497 U.S. 1003, 110 S. Ct. 3235 (1990); *Terre Du Lac Ass'n v. Terre Du Lac, Inc.*, 772 F.2d 467, 473 (8th Cir. 1985), *cert. denied*, 475 U.S. 1082, 106 S. Ct. 1460 (1986).  As it did previously, *see* Dkt. 66, the court looks to antitrust law to resolve whether the County has standing to bring its RICO claims against OptumRx.

Though broadly worded, the federal antitrust statutes are read against the backdrop of common law principles like proximate causation.  *Associated Gen. Contractors of California, Inc. v. Carpenters*, 459 U.S. 519, 529–33, 103 S. Ct. 897 (1983).  Law students across the country tend to first encounter the principle of proximate causation in *Palsgraf v. Long Island Railroad Company*, the famous Court of Appeals of New York case where a rail commuter, in his attempt to catch a train, precipitated a series of unfortunate events ultimately resulting in an explosion that dislodged scales at the other end of the train platform, striking and injuring the plaintiff.  248 N.Y. 339, 341, 162 N.E. 99, 99 (1928).  Under a proximate causation framework, an antitrust plaintiff's demonstration of a traceable injury is insufficient: it must also show that "the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133, 134 S. Ct. 1377 (2014); *see also Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 n. 5 (5th Cir. 2015).  Adherence to principles of proximate causation ensures that defendants are not responsible for the "remote consequences" of their

conduct.  *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 490 n.8, 88 S. Ct. 2224 (1968) (quoting *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533, 38 S. Ct. 186 (1918)); *see Holmes*, 503 U.S. at 268 (describing proximate causation as a judicial tool "used to limit a person's responsibility for the consequences of that person's own acts.").

In the context of antitrust litigation, this constraint operates both defensively and offensively.  *Hanover Shoe*, for instance, instructs that an antitrust defendant may not avoid liability when the antitrust plaintiff "passed on" the inflated prices to its customers.  392 U.S. at 490–93.  Likewise, in *Illinois Brick Co. v. Illinois*, the Supreme Court limited antitrust actions to plaintiffs who are the direct purchasers of a price-fixed product.  431 U.S. 720, 737, 97 S.Ct. 2061 (1977).

Because their holdings and logic govern here, the court finds it useful to review *Illinois Brick* and its progeny.  In *Illinois Brick*, state and local governments brought price-fixing claims against manufacturers of concrete blocks.  431 U.S. at 724–27.  Though the plaintiffs had not purchased the blocks from the defendants, they argued that the price-fixing conspiracy harmed them because they had hired contractors who had directly contracted with the defendants and passed on part or all of the defendants' overcharges in setting their prices.  *Id.* at 726–27.

The Court rejected this argument, reasoning that "allowing offensive but not defensive use of pass-on [damages] would create a serious risk of multiple liability for defendants," because both direct and indirect purchasers would be entitled to recover for the same overcharge.  *Id.* at 730.  The Court emphasized the practical and empirical difficulties with measuring pass-on damages that motivated its decision in *Hanover Shoe*, explaining that "apportion[ing] the recovery" in antitrust suits "among all potential plaintiffs that could have absorbed part of the overcharge . . .

would add whole new dimensions of complexity" to antitrust litigation and "seriously undermine [its] effectiveness." *Id.* at 737.

The Court reiterated its desire to "avoid burdening [antitrust] actions with damages issues giving rise to the need for massive evidence and complicated theories" just five years later in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 475 n. 11, 102 S. Ct. 2540 (1982). As *McCready* cautioned, that "[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy" was no reason to empower "every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages." 457 U.S. at 476.

Those concerns guided the Court's holding in *California State Council of Carpenters* one year later. 459 U.S. at 544–45. That case asked whether union plaintiffs had antitrust standing to bring allegations that a multiemployer association and its members coerced third parties and association members to enter business relationships with nonunion firms. *Id.* at 520–21. The Ninth Circuit reversed the district court's dismissal on the grounds that the union "was within the area of the economy endangered by a breakdown of competitive conditions" and that the defendants "specifically intended" to harm the union. *Id.* at 525. The County echoes some of these same concerns in its briefing, noting that it "has been damaged by the fraudulent scheme by paying for the at-issue drugs at…egregiously inflated prices" while defendants, including OptumRx, profited. *See* Dkt. 169 at 7. "That alone," the County declares, "should be dispositive on OptumRx's motion to dismiss." *Id.* But the *Carpenters* Court was unpersuaded by similar policy gestures. Instead, looking to principles of proximate causation, it concluded that only the "immediate victims of coercion by [the] defendants" could have a cause of action against them. 459 U.S. at 532, 541–42.

The Supreme Court's embrace of *Illinois Brick*'s indirect purchaser bar has both paralleled its commitment to principles of proximate causation and evolved, somewhat, beyond them. Whereas the *Carpenters* Court described "the directness or indirectness of the asserted injury" as one of "[a] number of…factors [that] may be controlling," 497 U.S. at 538–41, the Court would later describe the indirect purchaser bar as a "bright line" rule. Seven years after *Carpenters*, this fashioning of *Illinois Brick* as a bright-line rule animated the Court's refusal to create an exception to the indirect purchaser bar even when complicated damage calculations were not in issue. *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 204, 110 S. Ct. 2807 (1990). *UtiliCorp* featured a price-fixing conspiracy similar to the one here. *See id.* There, an investor-owned public utility purchased natural gas from a pipeline company for its own use and for commercial and residential resale. *Id.* at 204. The supposed antitrust violators consisted of a pipeline company and several gas-production companies that had together conspired to fix the price paid by the utilities. *Id.* The state petitioners asserted claims on behalf of the consumers themselves, as well as state agencies, municipalities, and other political subdivisions that had purchased gas from the defendants. *Id.* at 205. On appeal, the Tenth Circuit held that the state was not the proper plaintiff for its citizen-consumers who paid inflated prices for natural gas when the lawsuit already included the first actor to experience the overcharge: the public utilities. *Id.* at 205–06.

The Supreme Court agreed because the consumers represented by the state were indirect purchasers. *Id.* at 207–08. In rejecting the states' multifaceted challenges to the application of *Illinois Brick*'s logic to the facts on hand, the *UtiliCorp* Court was unmoved. To be sure, it acknowledged that "[t]he rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases." 497 U.S at 216. Despite this, it concluded that "[t]he possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule." *Id.*

at 216.  In that vein, the Court explicitly cautioned lower courts from engaging in "an unwarranted and counterproductive exercise to litigate a series of exceptions" to *Illinois Brick*.  *Id.* at 217.

The resulting "bright line" rule is straightforward: "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A.  But B may sue A if A is an antitrust violator.  And C may sue B if B is an antitrust violator."  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) (citing *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481–482 (7th Cir. 2002) (Wood, J.)).  By this logic, if B does not sell to C, C cannot recover from B, even if B is an antitrust violator.[4]  *See id.*

That is a formula the County cannot satisfy.  The County does not allege that OptumRx directly provided it with PBM services.  Rather, it alleges that OptumRx's predecessor, Catamaran, "entered into a contract with Cigna to become Cigna's exclusive pharmacy benefit partner…to provide PBM services to more than 8 million Cigna clients and members," including the County. Dkt. 127 at 37 ¶ 179.  To be sure, OptumRx continued this arrangement after acquiring Catamaran. *Id.* 38 ¶ 181.  But—because Cigna is the apparent intermediary—at no point does the County allege it directly paid OptumRx for its PBM services.  *See id.* ¶ 182.  Nor can the County surmount *Illinois Brick* insofar as it sues OptumRx in its capacity as a mail-order pharmacy.  Though the County alleges that OptumRx "dispensed diabetes medications...nationwide and in Texas, including in Harris County," it fails to allege that it directly purchased diabetes medications from OptumRx. *Id.* 39 ¶ 189.  Accordingly, and in keeping with *Illinois Brick*'s indirect purchaser bar, the court concludes that the County lacks standing to bring its RICO claims against OptumRx.

---

[4]     Treatment of *Illinois Brick* as a bright-line rule does not represent a departure from the principle of proximate causation so much as it illustrates a tightening of the requisite causal nexus between the injury and injurious conduct.  Indeed, as the Supreme Court has explained elsewhere, "[t]he proximate-cause inquiry is not easy to define, and over the years it has taken various forms." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133, 134 S. Ct. 1377 (2014).

The County challenges this conclusion.  It argues that *Illinois Brick* does not apply if the complaint alleges that a defendant participated in a RICO conspiracy and the plaintiff directly paid a co-conspirator.  Dkt. 169 at 7–8.  To use the *Apple* Court's language, the "co-conspirator exception" posits that C may sue A, even though A did not sell to C, because A worked with B and B sold to C.  *See* 139 S. Ct. at 1521.  This court previously adopted this so-called "co-conspirator" exception in its September 2020 Order, concluding that the County had standing to bring claims against the Manufacturer Defendants from whom it did not directly purchase diabetes medications.  Dkt. 66 at 32–34.  Looking to that Order, the County seeks to apply the co-conspirator exception to an alleged horizontal conspiracy between OptumRx and the PBM Defendants, including Cigna, CVS Caremark, and AetnaRx—the three PBMs with whom it directly contracted for PBM services.  *See* Dkt. 127 at 92–93 ¶¶ 407–10.  Because OptumRx allegedly conspired with direct formulary servicers, the County contends that it should be held jointly and severally liable under basic notions of conspirator liability.  *See* Dkt. 169 at 17; *see also* Dkt. 127 at 37–38 ¶¶ 179–80.

Though no Fifth Circuit case is on point, the County's position finds some support in certain courts of appeals.  In *Paper Systems*, for instance, the Seventh Circuit concluded that:

> If [Defendant] Nippon Paper participated in a [cartel conspiracy] . . . then it is jointly and severally liable for the cartel's entire overcharge. That the plaintiffs did not buy from Nippon Paper directly, or at all, does not matter . . . It was improper to dismiss Nippon Paper as a defendant while its status as a member of the cartel remains to be determined.

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 634 (7th Cir. 2002).  Were the court to follow *Paper Systems*, the legal issues would be narrowed to whether the County sufficiently alleged a horizontal conspiracy between OptumRx and CVS Caremark, AetnaRx, and Cigna—an issue the parties devote considerable attention to in their briefing.  *See* Dkts. 148 at 17–18, 169 at 10–18, 173 at 2–3.

17

The co-conspirator exception was one of many that proliferated throughout the lower courts following *Illinois Brick*. The Ninth Circuit's 1984 decision in *State of Arizona v. Shamrock Foods Company* offered the first full articulation of the exception within the circuit courts.[5] 729 F.3d 1208, 1211 (9th Cir. 1984). In that case, consumers sued a dairy wholesaler for fixing the prices of dairy products sold through grocery stores and by home-delivery. *Id.* at 1210. Though the consumer plaintiffs initially omitted them from their suit, they modified their price-fixing theory to include both the dairy producers and the grocery stores, arguing that the producers conspired amongst themselves and with the stores to fix the price of products. *Id.* at 1210–11. In a "two-tier conspiracy," the Ninth Circuit concluded that *Illinois Brick*'s aim of avoiding complex damage computations was not frustrated because overcharges were "not passed on to the consumers through any other level of the distribution chain." *Id.* at 1214.

More recently, in *In re National Football League's Sunday Ticket Antitrust Litigation*, a divided Ninth Circuit panel relied on the co-conspirator exception to resolve a standing dispute when plaintiffs alleged injury from a multi-tiered conspiracy involving DirecTV and the NFL. 933 F.3d 1136, 1157 (9th Cir. 2019). Looking to the principles of proximate causation, that court concluded that "when co-conspirators have jointly committed the antitrust violation, a plaintiff

---

[5]     From this court's research, the Seventh Circuit's decision in *Fontana Aviation, Inc. v. Cessna Aircraft Company* was the first amongst the Courts of Appeals to support suspending *Illinois Brick* in the context of multi-tiered price-fixing conspiracies. *See* 617 F.2d 478, 481 (7th Cir. 1980). In that case, a divided panel opined that it was "not satisfied that the *Illinois Brick* rule directly applies in circumstances where the manufacturer and the intermediary are both alleged to be co-conspirators in a common illegal enterprise resulting in intended injury to the buyer." *Id.* at 481. Before that, the co-conspirator exception's roots can be traced to *Gas-A-Tron of Ariz. v. Am. Oil Co.*, No. CIV 73-191-TUC-WCF, 1977 WL 1519, at *2 (D. Ariz. Dec. 7, 1977).

who is the immediate purchaser from any of the conspirators is directly injured by the violation." *Id.* at 1157.[6]

Though it is still the law of the Ninth Circuit, other courts of appeals (or panels therein) have commented that "*UtiliCorp* implies that the only exceptions to the *Illinois Brick* doctrine are those stated in *Illinois Brick* itself"—and the co-conspirator exception is not one of them. *See In re Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997), *abrogated on other grounds by Rivet v. Regions Bank of La.*, 522 U.S. 470, 118 S. Ct. 921 (1988). For its part, even before *UtiliCorp*, the Fifth Circuit declined to recognize the co-conspirator exception. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979) ("[W]e do not think that the reasoning of *Illinois Brick* permits recognizing the exception when, as here, the alleged co-conspirator middlemen are not named as parties defendant."). *See also Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002) (declining to resolve whether it would recognize a co-conspirator exception to *Illinois Brick*).

Apart from the Supreme Court's admonishment that courts not engage in the "unwarranted and counterproductive" creation of exceptions to *Illinois Brick*, *UtiliCorp*, 497 U.S. at 217, the court notes that the co-conspirator exception rests upon the rejection of *Hanover Shoe* and *Illinois Brick*'s core logic. Application of the direct purchaser rule in the context of a multi-tiered

---

[6]     The subsequent procedural developments in *Sunday Ticket* merit mention. Following the Ninth Circuit's decision, the National Football League appealed to the Supreme Court. Though the Court denied the League's petition for a writ of certiorari, Justice Kavanaugh issued a statement explaining that the interlocutory posture of the case counseled against further review. *See Nat'l Football League v. Ninth Inning, Inc.*, 141 S. Ct. 56, 57 (2020) (Kavanaugh, J., respecting the denial of certiorari). More importantly, Justice Kavanaugh opined that the *Sunday Ticket* "plaintiffs may not have antitrust standing to sue the NFL" because the Court's "case law 'authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers.'" *Id.* (citing *Apple Inc.*, 139 S.Ct. at 1520) (emphasis original). In a concluding remark, Justice Kavanaugh offered that if the NFL did not "prevail at summary judgment or at trial," it could "raise those legal arguments again in a new petition for certiorari." *Id.*

conspiracy would limit actions to the intermediary conspirators, the so-called middlemen.  Holding the intermediaries liable for their own anticompetitive conduct ostensibly deters them from participating in vertical price-fixing conspiracies in the future.  *See* Herbert Hovenkamp, *The Rationalization of Antitrust*, 116 Harv. L. Rev. 917, 941 (2003) ("The other justification for the rule against indirect purchaser recovery is that focusing the entire damage action on the first purchaser in line *increases enforcement incentives* by concentrating relatively large amounts of damages on relatively few plaintiffs.") (emphasis added).  But what of the manufacturers?  In justifying exceptions to the *Illinois Brick* rule, some courts have determined that extending liability to the highest echelons of a price-fixing conspiracy "is another vital instrument for maximizing deterrence."  *See Paper Sys.*, 281 F.3d at 633 (citing Lewis A. Kornhauser & Richard L. Revesz, *Sharing Damages Among Multiple Tortfeasors*, 98 Yale L. J. 831 (1989)).  Without extending liability to these bad actors in the context of a price-fixing conspiracy, consumers would have little recourse to address anticompetitive conduct originating at the top, leaving manufacturers to enjoy the fruits of their illegality while the intermediaries foot the bill.  If that bill sufficiently deterred the intermediaries from participating in a multi-tiered-price-fixing-conspiracy, manufacturers could nevertheless still conspire amongst themselves to fix prices and be shielded from suit if the intermediaries refrained from suing and, instead, passed on the costs to consumers.

And, yet, that is the very scenario that the *Illinois Brick* Court sanctioned when it barred indirect purchasers from bringing antitrust claims.  To boot, the Court explained that "allowing indirect purchasers to recover using pass-on theories…would transform treble-damages actions into massive multiparty litigations *involving many levels of distribution* and including large classes of ultimate consumers *remote from the defendant*."  *See* 431 U.S. at 740 (emphasis added).  If the intermediaries who directly purchase price-fixed products do not sue the manufacturers, it is

20

because the *Illinois Brick* Court's gamble "to identify the most efficient plaintiff for the overcharge in price-fixing cases" failed to pay off.  *See* William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev. 1445, 1488–90 (1985).  That is not a doctrinal change this court can make.  Thus, while the County initially persuaded the court of the co-conspirator exception's applicability and legality, a new amended complaint, and a close reading of the caselaw with fresh eyes reveals the exception's inconsistencies with the Supreme Court's holdings and express admonitions.  *See UtiliCorp*, 497 U.S. at 216–17; *Illinois Brick*, 431 U.S. at 740.

Returning to *Paper Systems*—the Seventh Circuit decision upon which the County's liability theory is based—it joins the Ninth Circuit's *Shamrock* decision on the wrong side of *Illinois Brick*'s "bright line."  As a different Ninth Circuit panel helpfully observed after *UtiliCorp*, *Paper Systems* "contradicts the Supreme Court's admonition not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.'"  *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 755 n. 7 (9th Cir. 2012) (quoting *UtiliCorp*, 497 U.S. at 216)).  This court agrees.  The County's strongest theory—that OptumRx engaged in a horizontal conspiracy to price-fix with the PBM defendants from whom the County directly paid—does not surmount *Illinois Brick*'s tall wall against indirect purchaser suits.  Accordingly, OptumRx's motion to dismiss is GRANTED as to the County's antitrust and RICO claims.

### B.  The County's State Law Claims

OptumRx also moves to dismiss the County's DTPA, unjust enrichment, money-had-and-received, and civil conspiracy claims.  Dkt. 127 at 155.  OptumRx contends that the County's DTPA claim must be dismissed because the County no longer alleges that it conferred a direct benefit on OptumRx.  Dkt. 148 at 7.  The absence of a direct benefit is also, OptumRx argues, fatal to the County's unjust enrichment and money-had-and-received claims.  *Id.*  Finally, because the

County's civil conspiracy claim derives from its underlying tort allegations, it must also be dismissed. *Id.* The County responds that these claims survive because it successfully alleged facts against OptumRx's co-conspirators and that OptumRx is liable under conspirator liability. *See* Dkt. 169 at 30–31.

### 1. DTPA Claims

The DTPA grants consumers a cause of action for false, misleading, or deceptive practices or acts. Tex. Bus. & Com. Code Ann. § 17.50(a)(1); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996). Among other things, the DTPA prohibits "any unconscionable action or course of action," which it defines as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code Ann. §§ 17.45(5), 17.50(a)(3).

Two or more entities can be held liable for a conspiracy to violate the DTPA. *Laxson v. Giddens*, 48 S.W.3d 408, 411 (Tex. App.—Waco 2001, pet. denied). *See also Off. Stanford Invs. Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2015 WL 13741905, at *7 (N.D. Tex. Feb. 4, 2015) ("Texas Courts have held generally that any agreement to undertake an unlawful act may support a claim for conspiracy.") However, because anticompetition allegations raised in a DTPA claim must "be harmonized with federal antitrust law," the court must determine if the County's DTPA conspiracy claim is "virtually identical to [its] [RICO] allegations." *See Abbott Lab'ys, Inc. (Ross Lab'ys Div.) v. Segura*, 907 S.W.2d 503, 505 (Tex. 1995) (citing Tex. Bus. & Com. Code Ann. § 15.04).

OptumRx observes that the County no longer alleges an underlying DTPA violation against it because it "no longer alleges that it had a relationship with OptumRx." Dkt. 148 at 24. The County appears to concede this, but it argues that its DTPA claim against OptumRx may still

proceed because it "has sufficiently alleged that OptumRx conspired with the other Defendants." Dkt. 169 at 31.[7]

In support of its claim that the Defendants conspired to violate the DTPA, the County alleges that "each of the PBM and Manufacturer Defendants, as well as their co-conspirator Cigna, agreed to and carried out acts in furtherance of the Insulin Pricing Scheme that artificially…inflated the price of diabetes medications." Dkt. 127 at 159 ¶ 694(a). The County alleges that CVS Caremark, Express Scripts, and OptumRx each "had express agreements" with the Defendant Manufacturers "related to the Manufacturer Payments paid by the Manufacturer Defendants." *Id.* 28 ¶¶ 123, 169, 190. It also alleges that some of the Manufacturer Defendants even "admitted" to the United States House of Representatives Committee on Energy and Commerce that "they agreed to and did participate in the Insulin Pricing Scheme and that the rise of insulin prices was a direct result of the scheme." *Id.* 78 ¶ 339. For example, Novo Nordisk "directly admitted that 'as the manufacturer, we do set the [reported] price and have full accountability for those increases.'" *Id.* ¶ 340. Novo Nordisk reported that price increases were necessary for it to stay on the PBM's preferred formularies. *Id.* In addition, Novo Nordisk explained that:

> There is this perverse incentive and misaligned incentives (in the insulin pricing system) and this encouragement to keep [reported] prices high. And we've been participating in that system because the higher the [reported] price, the higher the rebate . . . There is a significant demand for rebates. We spent almost $18 billion in rebates in 2018 . . . If we eliminate all the rebates . . . we would be in jeopardy of losing [our formulary] positions.

*Id.* ¶ 341. Eli Lilly also allegedly admitted that "it raises reported prices as a *quid pro quo* for formulary positions," noting that "drug makers sharply raise reported prices without a

---

[7] The court previously denied the defendants' motion to dismiss on the County's DTPA claims in its March 2021 Order, concluding that the County plausibly pleaded underlying DTPA claims against all the defendants. Dkt. 82 at 13.

corresponding increase in net price" because "PBMs demand higher rebates in exchange for

including the drug on their preferred-drug lists." *Id.* ¶ 342.  For their part, the "PBM Defendants

also admitted at the April 2019 Congressional hearing that they grant preferred…formulary

position because of higher rebates." *Id.* 79 ¶ 346.

By its own terms, the FAC reflects that these allegations, at bottom, refer to the same

anticompetitive conduct raised in its RICO claims:

> In a competitive market such as this one unilateral price increases would result in
> loss of market share and removal from preferred positions on PBM Defendants'
> formularies.  Thus, it would have been economically irrational for any one
> Manufacturer Defendant to raise its prices without assurance that its competitors
> would also increase prices and assurances from PBM Defendants that it would
> receive preferred formulary positions in exchange for these inflated prices.

*Id.* 160 ¶ 694e.  *Compare* Dkt. 127 at 160 ¶¶ 694(e), 694(h)–(j), *with* Dkt. 127 at 111–51 ¶¶ 489–

670.

The Texas Supreme Court's decision in *Segura* controls here.  That case began on the

state's allegations that manufacturers "conspired with each other to fix the wholesale price of infant

formula and with [the American Academy of Pediatrics] to monopolize markets for infant formula

and infant formula advertising." *Segura*, 907 S.W.2d at 504.  The state initially raised these claims

under Texas' antitrust law, but a lower court dismissed them after concluding that the state was an

indirect purchaser.  *Id.* at 504.  Infant formula consumers then intervened and "brought claims for

damages against the manufacturers for the same conduct alleged by the state," including

allegations that they implemented nearly identical price increases.  *Id.* at 504–05.  Rather than

follow the state and bring their claims under the Antitrust Act, the intervenors alleged that the

anticompetitive conspiracy violated the DTPA's prohibition against unconscionable conduct.[8]  *Id.*
*See also* Tex. Bus. & Com. Code Ann. § 17.50(a)(3).

Though raised under the DTPA, the *Segura* Court observed that the intervenors' claims
were "in essence antitrust claims."  907 S.W.2d at 507.  And, because the legislature required
courts to harmonize Texas' antitrust law with federal antitrust law, that court determined that
*Illinois Brick*'s indirect purchaser bar applied to the intervenors' DTPA claims as they, too, had
failed to show that they directly purchased the infant formula from the manufacturers.  *Id.* at 507.
Indeed, the court advised that it would "not interpret the DTPA in a manner that rewards creative
pleading at the expense of consistent legal principles."  *Id.*

Like in *Segura*, the County's conspiracy allegations "masquerade" as "consumer
protection" claims despite mirroring "prohibited antitrust" claims under federal law.  *See id.*  *See
also* Dkt. 127 at 159–63 ¶¶ 694–95.  Just as *Illinois Brick* foreclosed the County's RICO claims
against OptumRx, so, too, does it stand as a firewall against its DTPA conspiracy claims.  So, for
the County's anticompetition DTPA conspiracy claims against OptumRx to survive, there would
have to be a co-conspirator exception to the indirect purchaser bar.  For reasons already discussed,
there is no co-conspirator exception recognized by the Fifth Circuit or the Supreme Court, and the
exception recognized in other circuits is inconsistent with *Illinois Brick* and its progeny.
Accordingly, the Court GRANTS OptumRx's motion to dismiss the County's DTPA claims.

### 2.  Unjust enrichment, money-had-and-received, and civil conspiracy

The court now turns to the County's unjust enrichment, money-had-and-received, and civil
conspiracy claims.  "Unjust enrichment claims are based on quasi-contract."  *Fortune Prod. Co.*

---

[8]      The manufacturers argued that "classic antitrust claims of price-fixing and
monopolization" were not cognizable under the DTPA.  *Segura*, 907 S.W.2d at 504.  The *Segura*
Court did not decide that issue.

*v. Conoco, Inc.*, 52 S.W.3d 671, 683 (Tex. 2000).[9]   "The principal function of quasi-contract is generally said to be that of prevention of unjust enrichment."   Calamari et al., The Law of Contracts, § 1–12 (3d ed. 1987).   But when an express contract exists, "there can be no recovery under a quasi-contract theory."[10]   *Fortune*, 52 S.W.3d at 684.   As the Fifth Circuit has observed, "[g]ood reason supports that rule: quasi-contract actions *presuppose* no contract governs the dispute."   *See Villarreal v. First Presidio Bank*, 744 F. App'x 204, 206 (5th Cir. 2018) (emphasis original); *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 815 (Tex. App.—Dallas 2012, no pet.) ("The quasi-contractual action for money had and received is a cause of action for a debt *not* evidenced by a written contract between the parties.") (emphasis added).   Thus, as § 107 of the Restatement (First) of Restitution provides:

> A contracting party is entitled to receive from another contracting party what the other has promised and if the contract is between persons of full capacity and is not voidable, he is not entitled to receive more than this, unless the other has failed to perform. On the other hand, a person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed between them the other should give in return.

Restatement (First) of Restitution § 107(a)(1) (1937).

---

[9]    The court analyzes the County's unjust enrichment and money-had-and-received claims under the same rubric because "[a] cause of action for money had and received belongs conceptually to the doctrine of unjust enrichment."   *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App. 1997, no writ).

[10]    To be sure, there are some exceptions to this rule.   A claim for restitution or unjust enrichment might still be made when, for instance, a defendant verbally contracted to sell a certain item at an agreed-upon price sells it and later denies his counterpart an interest in the proceeds of the sale.   *See, e.g.*, *Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 687–88 (1951) (allowing restitution for excess money held by defendant after selling plaintiffs' cotton harvester pursuant to oral contract).   Likewise, restitution might be available where a party overpays an agreed-upon rate.   So, for instance, if A contracts to buy widgets from B for $65.00 and B then refuses to deliver the widgets unless A pays him $110.00, A may bring an unjust enrichment claim.   *See, e.g., Bowers v. Missouri, Kan. & Tex. Ry. Co.*, 241 S.W. 509, 510–11 (Tex. App.—Texarkana 1922, no writ) (allowing restitution for freight charges paid in excess of rates specified in shipping contract); *Nat. Gas Pipeline Co. of Am. v. Harrington*, 246 F.2d 915, 921 (5th Cir. 1957) (agreeing that plaintiff was entitled to restitution where it paid, "involuntarily and under protest," in excess of contracted-for price).   These exceptions do not apply here.

Other courts agree that this principle presents a high hurdle for plaintiffs alleging price-fixing claims to surmount.  For example, in *In re Intel Corp. Microprocessor Antitrust Litigation*, the plaintiffs bought—and paid the purchase price for—computers whose microprocessors were artificially inflated.  496 F. Supp. 2d 404, 421 (D. Del. 2007).  Like the County, the *Intel* plaintiffs did not allege that they did not receive the benefit of their bargain, but objected to the artificially inflated price that they paid.  *Id.  See also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 210 (D. Me. 2004) ("In any event, unjust enrichment ordinarily does not furnish a basis for liability where parties voluntarily have negotiated, entered into and fully performed their bargain, as consumers do in buying vehicles.").

In that respect, just as in *Intel*, the County's claims sound more in contract than in quasi-contract.  In the FAC's own words, the PBM Defendants "contract with payors."  Dkt. 127 at 85 ¶ 367.  The Defendants "set[] prices for…diabetes medications marketed and sold" and that "payors, including [the County],…paid for diabetes medications based on fraudulently inflated prices."  *Id.* 168 ¶¶ 720–21.  Against OptumRx's co-defendants, the County paid its purchase price for PBM services, obtained them, and does not assert that it failed to receive the benefit of its bargain.

Generally, for these reasons, the court would just conclude that the County's unjust enrichment claim against OptumRx fails.  However, it pauses to note the unique procedural background of this case.  The County bases its unjust enrichment claim against OptumRx based on conspirator liability—that "OptumRx is responsible for all alleged acts done by any of the conspirators in furtherance of the Insulin Pricing Scheme."  Dkt. 169 at 9.  *See also* Dkt. 127 at 168 ¶¶ 726.  The court previously found in its September 2020 Order that the County alleged stand-alone unjust enrichment claims against the defendants.  *See* Dkt. 66 at 40.  In that order, the court mistakenly concluded that because the County pleaded fraud—a bad act—and because allegations

of a bad act were necessary to state a claim for unjust enrichment, the County had sufficiently pleaded its claim.  *See id.* at 39–40.  Alternately reticent to challenge and ready to embrace the court's prior order, both parties spill ink debating whether the County sufficiently alleged a conspiracy between OptumRx and its co-defendants.  *See Off. Stanford Invs. Comm.*, 2015 WL 13741905, at *7 (observing that conspirator liability may apply to torts).  In the end, whether it did does not matter: allegations of the bad act are insufficient to move the County out of the realm of contract and into the domain of quasi-contract, and the unjust enrichment claims on which the County bases its conspiracy allegations cannot stand on their own.  Accordingly, the court GRANTS OptumRx's motion to dismiss the County's unjust enrichment and money-had-and-received claims.

Finally, civil conspiracy is a derivative tort.  *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140–42 (Tex. 2019).  Because the County's DTPA, unjust enrichment, and money-had-and-received claims fail, its civil conspiracy claim also fails.  Accordingly, the court GRANTS OptumRx's motion to dismiss the County's civil conspiracy claim.

### CONCLUSION

For the reasons outlined above, the Court rules as follows:

1. OptumRX's motion to dismiss is GRANTED for the County's RICO claims;

2. OptumRX's motion to dismiss is GRANTED for the County's Texas Deceptive Trades Practices-Consumer Protection Act claim;

3. OptumRX's motion to dismiss is GRANTED for the County's unjust enrichment claim;

4. OptumRX's motion to dismiss is GRANTED for the County's money-had-and-received claim; and

5. OptumRX's motion to dismiss is GRANTED for the County's civil conspiracy claim.

6.   All claims are dismissed with prejudice.


Signed at Houston, Texas on February 16, 2022.

Gray H. Miller
Senior United States District Judge